James ABOUREZK, et al., Plaintiffs,

v.

Ronald W. REAGAN, et al., Defendants.

CITY OF NEW YORK, et al., Plaintiffs,

v.

George P. SHULTZ, et al., Defendants.

Bruce CRONIN, et al., Plaintiffs,

v.

George P. SHULTZ, et al., Defendants.

Civ. A. Nos. 83–3739, 83–3741
and 83–3895.

United States District Court,
District of Columbia.

July 27, 1984.

Leonard B. Boudin, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, Steven R. Shapiro, Arthur Eisenberg, New York Civil Liberties Union, New York City, Margaret Crosby, American Civil Liberties Union of Northern California, San Francisco, Cal., Burt Neuborne, Charles S. Sims, American Civil Liberties Union, New York City, Amit Pandya, Susan W. Shaffer, American Civil Liberties Union, Washington, D.C., Frederick A.O. Schwarz, Jr., Corp. Counsel, New York City, for plaintiffs.

Robert L. Bombaugh, Thomas W. Hussey, David V. Bernal, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

These cases present the question whether the Secretary of State[1] is required to issue visas to aliens whom plaintiffs—citizens and residents of the United States— have invited to come to the United States for the purpose of associating with them and hearing them speak on issues of public concern.

While there are a number of subsidiary questions in these cases, the legal issue which ultimately governs is relatively straightforward. In *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), the Supreme Court decided that, in view of the broad authority vested by the Constitution in the Congress and the Executive over the admission of aliens and the conduct of foreign affairs, the Judiciary may do no more, in circumstances such as these, than to inquire whether the government has provided a "facially legitimate" explanation for its refusal to permit an alien to enter. If such an explanation is given, a court is not free to question the underlying policy or the wisdom of the decision, but it must defer to the political branches. As discussed below, facially legitimate reasons have been provided here, and the decision of the Secretary will therefore be upheld.

### I

*Abourezk* (C.A. No. 83-3739) involves an invitation extended by several of the plaintiffs to Tomas Borge, Interior Minister of Nicaragua, to come to the United States for various purposes. Some of the plaintiffs state that they wish Mr. Borge to engage in a five-day speaking tour; others, who are members of Congress, assert that

1. The Secretary of State and the Attorney General both have responsibilities concerning the admission of aliens. See 8 U.S.C. §§ 1103, 1104. These cases involve primarily the powers and responsibilities of the Secretary.

they want to meet with Mr. Borge privately to gain his perspective on Central American affairs; still others, who are journalists, claim that they intend to interview Mr. Borge; and several university professors allege that they wish to have Mr. Borge speak at a university or before religious groups.

*Cronin* (C.A. No. 83–3895) involves an invitation extended to Nino Pasti, a former member of the Italian Senate and of the Italian armed forces, and the present president of an organization named Lotte per la Pace (Struggle for Peace). According to the Department of State, Mr. Pasti is also an active participant in the activities of World Peace Council, an instrumentality of the Soviet government. Mr. Pasti was invited to speak at one or more rallies sponsored by two organizations—the Mobilization for Survival and the New England Campaign to Stop the Euromissiles—which are seeking to change United States nuclear policies through public demonstrations and other means.

*City of New York* (C.A. No. 83–3741) involves an invitation extended by the Commission on the Status of Women, a New York City agency, to Olga Finlay and Leonor Rodriguez Lezcano, two Cuban women, who are said by plaintiffs to have special expertise on the status of women in Cuba. According to the government, both are members of the Federation of Cuban Women, an instrumentality of the Cuban Communist Party. Ms. Finlay and Ms. Lezcano were invited to come to the United States to speak in New York City, at several universities across the country, and at such organizations as the Third World Women's Project, and the Committee on Religion, Ethics, and Social policy.

2. It appears that Mr. Borge had on a previous occasion applied for and been granted a visa which he never used. Mr. Pasti had also previously been granted visas some of which he used for travel in the United States and at least one of which he did not use. Ms. Lezcano had not previously sought a visa, but Ms. Finlay had sought and obtained visas on prior occasions.

3. The visas for Ms. Finlay and Ms. Lezcano were submitted by the Cuban Ministry of For-

Each of the invited aliens applied for a visa[2] at the appropriate American consulate or embassy.[3] Because the applications involved possible denials for foreign policy reasons, they were forwarded for review to the Assistant Secretary of State for Consular Affairs in Washington, in accordance with standing instructions,[4] and at least some of them were also reviewed by the then Under Secretary of State Lawrence Eagleburger. Eventually, the consular officers were instructed by the Department of State that the entry and the proposed activities of the aliens would prejudice the conduct of United States foreign affairs, and that the visas were to be denied pursuant to section 212(a)(27) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1182(a)(27) (hereinafter referred to as subsection (27)). The alien applicants were informed accordingly.

These actions followed. Presently pending before the Court is the government's motion for summary judgment.

## II

Plaintiffs do not contend that either the Constitution or any law grants to the invited aliens[5] the right to enter the United States. As indicated *infra*, such an argument would lack validity in any event. Rather, the claim is that the American plaintiffs were deprived of their rights under the First Amendment and under the Immigration and Nationality Act when they were denied the opportunity to associate with their invitees and to hear their speech in this country. Before examining these claims in detail, it is helpful to consider first the *Kleindienst* case *supra*, which resolves many of the issues underlying plaintiffs' claims.

eign Relations on their behalf by a diplomatic note to the United States consular officer in Havana.

4. Foreign Affairs Manual, vol. 9 (Visa T1–880, ¶ 1).

5. An "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

In *Kleindienst,* Ernest E. Mandel, a Belgian journalist and editor, was invited by a graduate student association at Stanford University [6] to participate in a conference on Technology and the Third World and thereafter to lecture at other major universities and conferences. Section 212(a)(28) of the Act excludes from the United States, among others, aliens who advocate communism or the establishment in the United States of a totalitarian dictatorship, and Mr. Mandel apparently was excludable as being in that category. Unlike the ban in subsection (27), that in subsection (28) may be waived by the Attorney General upon the recommendation of the Department of State.[7] No waiver was granted, and Mr. Mandel's application for a visa was rejected.

In the *Kleindienst* suit, the alien's sponsors made many of the same arguments that are advanced by the plaintiffs in this action. The Supreme Court sustained some of these contentions, and it rejected others. Thus, the Court held that an alien invitee has no personal constitutional right to enter this country; that insofar as his sponsors are concerned, they have a right under the Constitution not only to disseminate information and ideas but also to receive them; and that the possible availability of alternative means of receiving information and ideas (*e.g.,* telephone hook-ups, tapes, visits to a foreign country) does not extinguish or displace altogether this constitutional right.

Having said that, the Court, after reiterating the familiar rule that Congress has

plenary power over the admission of aliens, went on to hold that the First Amendment rights of individuals who wish to meet and speak with an alien do not necessarily override the power of the Executive, delegated by Congress, to deny waivers of the subsection (28) prohibition. Finally, the Court stated that:

> Appellees seek to soften the impact of this analysis by arguing ... that the First Amendment claim should prevail, at least where no justification is advanced for denial of a waiver.... The Government would have us reach this question, urging a broad decision that Congress has delegated the waiver decision to the Executive in its sole and unfettered discretion, and any reason or no reason may be given.... This record, however, does not require that we do so, for the Attorney General did inform Mandel's counsel of the reason for refusing him a waiver. And that reason was facially legitimate and bona fide.[8]

408 U.S. at 769, 92 S.Ct. at 2585.

The instant cases do not permit a decision based on the precise *Kleindienst* factors,[9] and the Court must therefore decide whether the Department of State has given a "facially legitimate and bona fide" reason for denying visas to the aliens who sought entry here.

### III

All three cases present two basic questions [10]—the meaning of subsection (27)

---

6. The University itself endorsed the invitation.

7. See 8 U.S.C. § 1182(d)(3)(A).

8. The reason given was that the alien had abused visas previously granted to him by going beyond the stated purposes of his trip.

9. None of the four aliens here involved has a record of abuse of visas.

10. The government also argues that the Court lacks subject matter jurisdiction, that plaintiffs have no standing to sue, and that the complaint fails to state a claim upon which relief may be granted. Plaintiffs, for their part, assert that the case is not ripe for summary judgment because

there are contested issues of fact. The Court rejects all these arguments.

The Supreme Court in *Kleindienst* considered the merits of the claim without discussing any of the preliminary issues here raised by the government—which it presumably would not have done had it had doubts about such matters as jurisdiction or standing.

In any event, courts have frequently exercised subject matter jurisdiction where it was alleged that First Amendment violations had occurred in the administration of the Immigration Act (see *e.g., Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Burrafato v. Department of State,* 523 F.2d 554, 556 (2d Cir.1975)), and they have likewise found jurisdiction where a citizen claimed misapplication of the Act with

and the constitutionality of the government's actions.[11] These will now be examined in turn.

Subsection (27) provides that members of the following class of aliens are ineligible to receive visas:

> Aliens who the consular officer ... knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety or security of the United States.

Plaintiffs raise two statutory construction points apart from their First Amendment claims.

■ First. Plaintiffs contend that subsection (27) speaks only of an alien's *activities* which might jeopardize the public interest or security, in contradistinction to aliens whose *entry or presence* in this country might have such an effect. In that view, the government may not, under that subsection, exclude an alien unless there is some reason to believe that he will engage in offensive *conduct.* To put it another way, plaintiffs argue that the statute does not permit the Department of State to exclude an alien whose conduct is presumed to be benign but whose presence alone in this country is regarded as prejudicial to the public interest, welfare, or security of the United States.

On a strictly textual basis, that contention is not unpersuasive, for the statutory provision mentions only "activities." However, in this context at least, the distinction between an alien's activities and his presence in the United States is one without a difference. The best proof of that proposi-

respect to an alien with whom he had some relationship. See, *e.g., Karmali v. INS,* 707 F.2d 408 (9th Cir.1983); *Acosta v. Gaffney,* 558 F.2d 1153 (3rd Cir.1977); *Pesikoff v. Secretary of Labor,* 501 F.2d 757 (D.C.Cir.1974). Such 19th century decisions as *The Chinese Exclusion Cases,* 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1884), upon which the government relies, have largely been ignored in favor of a more enlightened jurisprudence. It should also be noted that the decision here was made not by a consular official stationed abroad but by high-level State Department officials pursuant to general guidelines. Thus, decisions which have refused to consider discretionary determinations of consuls (*e.g., Gomez* [Rivera de Gomez] *v. Kissinger,* 534 F.2d 518 (2d Cir.1976)) have only limited application.

Many of the cases which have upheld jurisdiction in these circumstances also support plaintiffs' position on standing. See *Fiallo v. Bell, supra; Burrafato v. Department of State, supra; Pesikoff v. Secretary of State, supra.* Plaintiffs have suffered injury-in-fact and that injury is not vitiated merely because it may be shared by many others. See *Heckler v. Mathews,* ─── U.S. ───, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1983); *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). The cited cases also dispose of the government contention that plaintiffs are not within the zone of interests regulated by the statute or by the First Amendment. See also, *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

As for the government's assertion that the complaint does not state a claim upon which relief may be granted, the only arguments seriously pressed are mootness and ripeness. However, in view of the government's broad defense of its actions, plaintiffs have every reason to fear that the allegedly unlawful activity will continue. See *Kolender v. Lawson,* 461 U.S. 352, 75 L.Ed.2d 903, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). It may well be that American citizen standing would be lacking if there were not a reasonable nexus between them and a particular alien invitee. However, that is not so here.

Plaintiffs, as indicated, argue that these cases are not ripe for summary judgment. However, none of the factual issues they raise (whether subsection (27) has been used in the past to exclude aliens on foreign policy grounds, whether the government's actions are a stratagem to escape congressional restrictions on subsection (28), whether the content of the aliens' speech and their political beliefs played a role in the Executive's decisions to exclude them, and whether the foreign policy concerns asserted are of sufficient magnitude) represents a genuine issue of material fact. To the extent that these questions are not irrelevant, they represent issues of law or policy, or they are resolved by the Eagleburger *in camera* affidavits. See Part V *infra.*

11. Plaintiffs argue that if the government's construction of the statute is correct, it is unconstitutional under the First Amendment; or, in the alternative, that it should be construed narrowly to avoid an unconstitutional result. In the present context, the considerations governing these alternative contentions do not differ materially, and the two arguments will therefore be considered together. See Part IV *infra.*

tion is the case of the former Shah of Iran. The mere entry of the Shah into the United States and his presence in this country had the most serious consequences for the United States, including the seizure of American hostages in Teheran and all that flowed from that episode, including ultimately the loss of life in connection with the abortive rescue operation.[12] It is thus not surprising that the Executive, in construing subsection (27), has not made the distinction plaintiffs ask the Court to draw. Moreover, in the one decision that addressed this issue—*El-Werfalli v. Smith*, 547 F.Supp. 152 (S.D.N.Y.1982)—the court concluded that the mere presence of an alien in the United States was sufficient to trigger the subsection (27) prohibition even though the government did not suggest that he would engage in any offensive activities while here.[13]

Second. Plaintiffs argue next that the thrust of subsection (27) is to ensure the safety and security of the United States, and that an alien may therefore not be denied entry for foreign policy reasons and objectives which, according to plaintiffs, fall in a different category. That argument ignores a substantial part of the statute; *i.e.*, its reference to activities which may be prejudicial to the "public interest" and to those which might endanger the "welfare" of the United States. Leaving to one side the question whether these terms are so vague and broad that they lend themselves to the suppression of speech that the government finds inconvenient (see note 19 *infra*), it is clear that the statutory terms embrace harm to foreign policy interests if they mean anything beyond strictly domestic security concerns. Moreover, it appears that the statute has consistently been so interpreted ever since the Immigration and Nationality Act was enacted in 1952, by several different Administrations of both political parties.[14] See also, *Haig v. Agee*, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981); *United States v. National Association of Securities Dealers*, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975).

These conclusions are not undermined by the so-called McGovern Amendment.[15] As indicated, subsection (28) excludes from the United States aliens with communist affiliations, but it goes on to vest authority in the Attorney General to waive that restriction. While that official has apparently exercised his waiver authority on numerous occasions, he refused several waivers for foreign policy reasons. The McGovern Amendment directed the Attorney General not to exercise his waiver authority on this basis,[16] and plaintiffs deduce from that legislative action that foreign policy interests may not be considered under the Immigration and Nationality Act. However, subsection (27) is a much more closely targeted, narrow provision than is subsection (28) and, as indicated below,[17] it has been used only a few dozen times each year. Moreover, as stated above, unlike subsection (28), the provision under consideration here does not authorize waivers at all, but it provides instead that an alien in the exclud-

---

**12.** Needless to say, the Court has neither the authority nor the ability to determine whether that policy decision was the proper one under the circumstances. All that it considers here is that the Shah's presence in this country had substantial consequences in terms of the public interest and the security of the United States. Whether the consequences in that or in future cases outweigh other considerations (*e.g.,* the earlier cooperation of the Shah with the United States), is a decision for the President and his subordinate officers, not for a court or a private citizen.

**13.** El-Werfalli was a Libyan national who sought to enter the United States solely to attend school.

**14.** Congress was advised of the exclusion for policy reasons of Thomas Liaou, an advocate of Formosan independence (1958, 1961, 1962); Otto Skorzeny, a former Nazi SS officer (1959), and Mme. Ngo Dinh Nhu, sister-in-law of the former prime minister of Vietnam (1964).

**15.** P.L. 95–105, 91 Stat. 848 (1977), 22 U.S.C. § 2691.

**16.** Under the amendment, the Attorney General may deny waivers only with respect to aliens who pose a threat to United States "security interests."

**17.** See note 26 *infra*.

able class "shall" be ineligible for admission to the United States.

It is, of course, sometimes difficult to know precisely what the Congress intended, and the present situation is no exception. It may be that, by explicitly prohibiting the practice of denying subsection (28) waivers for foreign policy reasons, Congress meant to signal the Executive not to consider such reasons at all in its exclusion policy; or it may be that, by confining its prohibition to subsection (28), it did not intend to disturb the Executive's long-standing policy and practice of using subsection (27) for foreign policy reasons in addition to other reasons that may be encompassed under "public interest" or "welfare ... of the United States." In view of the substantial independent authority the Executive possesses in the fields of foreign relations and the admission of aliens, the Court would not be justified in interpreting the congressional action with respect to subsection (28) as a prohibition on Executive power generally unless the expression of legislative intent were far more clear than it is in this instance.

For these reasons, the Court concludes that, on its face, the statute sanctions the denial of the visas at issue here.

## IV

There are, of course, significant First Amendment implications to the statute. The Supreme Court has held that the First Amendment protects not only speech but also the right to receive information and ideas.[18] These plaintiffs claim accordingly that they are entitled to have the invited aliens enter the United States because they wish to exercise that right.[19] It is not an answer to say—as the government does—that there are alternative means (mails, television, travel abroad) to receive the message of these aliens, for as the Court said in *Kleindienst,*

> we are loath to hold on this record that existence of other alternatives extinguishes altogether any constitutional interest on the part of the appellees in this particular form of access.

408 U.S. at 765, 92 S.Ct. at 2583.[20]

However, it is also clear that consideration of the First Amendment does not end the inquiry, for the interest of citizens in being the beneficiaries of ideas from others must be considered in juxtaposition to the authority of the Congress and the Executive to regulate and conduct foreign relations. Moreover, under *Kleindienst,* where the basis for the visa denial bottomed on that authority is "facially legitimate and bona fide," the courts' role is at an end: they must defer to the Executive decision.

The government argues that, by its submission of Under Secretary Eagleburger's affidavit, it has provided a facially legitimate, bona fide basis for refusing entry to the four aliens. However, that affidavit is entirely conclusory; it states only that the entry of the particular aliens "would have been prejudicial to the conduct of the foreign affairs of the United States." Such conclusory statements might be adequate under some circumstances; they are not here.

**18.** In addition to *Kleindienst v. Mandel, supra,* see *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386–90, 89 S.Ct. 1794, 1804–06, 23 L.Ed.2d 371 (1969); *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

**19.** Plaintiffs also claim that, as construed by the Department of State, subsection (27) is overly broad and void for vagueness. But in foreign affairs matters and those involving the admission of aliens, the political branches have the widest possible latitude in these respects. See *Dames & Moore v. Regan,* 453 U.S. 654, 678–79, 101 S.Ct. 2972, 2986–87, 69 L.Ed.2d 918 (1981). It appears that no immigration statute has ever been invalidated on such grounds.

**20.** At least as to Ms. Finlay and Ms. Lezcano, there is doubt whether their American sponsors could visit them in Cuba. See *Regan v. Wald,* — U.S. ——, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984); *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).

In the absence of additional details, it could reasonably be concluded that the Department of State denied visas to these alien applicants because it did not agree with or feared the content of whatever communication they might make while in this country.[21] This conclusion would be especially relevant in these cases where the visa denials were defended, at least in part, on the ground that the Department of State considered the aliens' proposed "activities" in the United States to be prejudicial—yet the only activities that had been planned were protected speech and association.[22]

■ In the view of the Court, an alien invited to impart information and ideas to American citizens in circumstances such as these may not be excluded under subsection (27) solely on account of the content of his proposed message. For although the government may deny entry to aliens altogether, or for any number of specific reasons, it may not, consistent with the First Amendment, deny entry solely on account of the content of speech. *Regan v. Time, Inc.*, —— U.S. ——, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984); *Heffron v. International Society*, 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–2290, 33 L.Ed.2d 212 (1972).[23]

■ For these reasons, the Court rejects both the argument of plaintiffs that the government lacks the power to exclude

pursuant to subsection (27) unless it can be shown that there will be a direct threat to national security, and that of the government that incantation of the phrase "foreign policy objectives" is sufficient to end the Court's inquiry. Plaintiffs' theory, if adopted, would not adequately protect the national interest in its foreign relations; the government's theory would allow it to exercise its foreign relations power so as to keep the content of speech from American citizens.

In view of these holdings, the specific reasons for the exclusion of these four aliens thus assume paramount importance and that issue, as discussed below, requires the Court to consider the classified affidavits submitted by the government.

V

■ The government has offered for the Court's *in camera* inspection a classified affidavit of Under Secretary Eagleburger with respect to each of the three cases. Plaintiffs object to such an inspection, arguing that they have the right to view these affidavits and to contest the facts and conclusions they contain. It thus becomes necessary, initially, to determine whether the Court should avail itself of the Department's offer to review the Eagleburger affidavits on this basis.[24]

While consideration of documents outside the usual adversary process is certainly not desirable,[25] the Court has concluded that

---

**21.** The *Kleindienst* reason, by contrast, was susceptible of objective inquiry and verification. See note 8 *supra*. See also, *El-Warfalli v. Smith*, *supra* 547 F.Supp. at 153–54.

**22.** The term "public interest" in Subsection (27), standing alone, could be construed to permit the denial of a visa solely because the applicant might, once here, speak in opposition to the foreign policy interests of the government, the presumed theory being that the government's policy may be equated with the public interest. Indeed, government counsel asserted that unpalatable speech would be a valid reason for exclusion. It should be noted, however, that Under Secretary Eagleburger averred that he was "aware of no instance in which a [non-immigrant visa] request has been denied for reasons of foreign policy simply because the applicant was critical of our policies and objectives."

**23.** Special circumstances may permit an exception to this rule. For example, an alien could probably validly be excluded if he is not merely a citizen but a high official of a foreign nation whom the Executive could exclude or expel as *persona non grata* on any basis whatever. See 8 U.S.C. § 1102; H.Rep. No. 1365, 82d Cong., 2d Sess. 34 (1952), U.S.Code Cong. & Admin.News 1952, p. 1653.

**24.** On July 5, 1984, the Court issued an order for the submission of the affidavits without prejudice to either party's position on the *in camera* inspection issue.

**25.** However, because classified documents are involved, this kind of procedure is not unusual. See *Hayden v. National Security Agency*, 608 F.2d 1381 (D.C.Cir.1979); *Phillippi v. Central Intelligence Agency*, 546 F.2d 1009 (D.C.Cir. 1976).

the alternatives to such consideration are even more unpalatable. The Court has already held that the particular visa denials involved here could not be upheld on the basis of the open record alone. To find the conclusory statement that the entry of a particular individual would be contrary to United States foreign policy objectives to be a "facially legitimate" reason would be to surrender to the Executive total discretion even in cases such as these where it is claimed—and the claim is not implausible—that entry is being denied solely on account of the content of the alien's proposed speech. Moreover, judicial scrutiny of the specific reasons for denials of entry will have the beneficial effect of preventing both a mushrooming of exclusions based on the provision here at issue [26] and content-based denials.[27]

Equally unsatisfactory is the solution proposed by plaintiffs: to disregard the *in camera* affidavits, at least unless they are subjected to the full adversary process. The affidavits in this case—and presumably in future cases—are both classified and highly sensitive, and they therefore could not be subjected to that process. At the same time, the Court would not be justified in overruling the Secretary's decision merely because the specific reasons therefor cannot be made public. To do so would be to run afoul of the Supreme Court's mandate in *Kleindienst* that the courts must defer to the political branches where the reasons for the denials are bona fide on their face.[28]

 The Court has accordingly reviewed the Eagleburger affidavits *in camera*. On the basis of that review, it has concluded that facially legitimate reasons exist for denying visas to the four individuals whose entry is being sought in these actions. Essentially, these applicants were not denied entry because of the content of the expected speeches, but because of their personal status as officials of governments or organizations which are hostile to the United States. According to Under Secretary Eagleburger, some of these entities are desirous of acquiring legitimacy and respectability, and the admission of their officials to the United States would further that goal; [29] while others operate under false pretenses insofar as they claim to be independent of hostile powers. Under *Kleindienst*, and indeed because of the limited role of the Judiciary with respect to foreign relations generally, the Court is required to accept as valid the judgment of the Executive Branch that the foreign affairs of the United States would, in fact, be injured by the admission of aliens possessing these characteristics. Clearly, the reasons provided by the Executive are "facially legitimate." The government's motion for summary judgment will therefore be granted.

---

**26.** The Department asserts that, until now, of the millions of non-immigrant visas sought every year, the total number denied pursuant to subsection (27) for each of the last ten years has ranged from sixteen (FY75 and FY80) to sixty-three (FY76). During the last twenty years, almost 70 million non-immigrant visas were issued, and 519 were denied under subsection (27). Affidavit of Deputy Assistant Secretary of State Louis P. Goelz.

**27.** The mere existence of judicial scrutiny, albeit in an *in camera* setting, is likely to have a deterrent effect in this regard.

**28.** In *El-Warfalli v. Smith, supra,* the Court considered classified information, and the Court is advised that the U.S. District Court for the District of Massachusetts, where an action similar to these is pending, has likewise agreed to consider a classified affidavit *in camera*. *Allende v. Schultz,* No. 83–3984–C.

**29.** Plaintiffs argue that alternative means may be available for denying legitimacy to hostile individuals or organizations (*e.g.,* by advising foreign governments that admission based on First Amendment considerations does not imply endorsement by the United States). Neither the Court nor plaintiffs are empowered to make such foreign policy judgments.