785 F.2d 1043
 251 U.S.App.D.C. 355, 54 USLW 2481
 James ABOUREZK, et al., Appellants,
v.
Ronald Wilson REAGAN, President of the United States, et al.
CITY OF NEW YORK, et al., Appellants,
v.
George P. SHULTZ, Secretary of State, et al.
Bruce CRONIN, et al., Appellants,
v.
George P. SHULTZ, Secretary of State, et al.
 Nos. 84-5673, 84-5681 and 84-5708.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 23, 1985.
Decided March 11, 1986.
 
 Steven R. Shapiro, with whom Charles S. Sims, Frederick A.O. Schwarz, Jr. and Leonard Boudin were on brief for appellants in Nos. 84-5673, 84-5681 and 84-5708. Susan W. Shaffer also entered an appearance for appellants in Nos. 84-5673, 84-5681 and 84-5708.
 Michael Jay Singer, Atty., for appellees. Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Paul Blankenstein, Atty., were on brief for appellees in Nos. 84-5673, 84-5681 and 84-5708. Thomas W. Hussey and Barbara Herwig, Attys., also entered appearances for appellees in Nos. 84-5673, 84-5681 and 84-5708.
 Robert B. McKay was on brief for amicus curiae the Committee on Immigration and Nationality Law of the Ass'n of the Bar of the City of N.Y. urging reversal.
 Steven P. Quarles was on brief for amici curiae the American Ass'n of University Professors, et al. urging reversal.
 Before EDWARDS, GINSBURG, and BORK, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 Dissenting Opinion filed by Circuit Judge BORK.
 GINSBURG, Circuit Judge:
 
 
 1
 This case concerns the scope of the authority Congress accorded to the Secretary of State under the Immigration and Nationality Act of 1952, Sec. 182, 8 U.S.C. Sec. 1182(a)(27) (1982), to deny non-immigrant visas to aliens who wish to visit this country in response to invitations from United States citizens and residents to attend meetings or address audiences here. The district court, granting the government's motion for summary judgment, held that the specific visa denials at issue were within the State Department's statutory and constitutional authority. See Abourezk v. Reagan, 592 F.Supp. 880 (D.D.C.1984). We conclude that the district court incorrectly analyzed the statutory construction issue, and that questions of material fact remain. Accordingly, we vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion.
 
 I.
 
 2
 We describe first the statutory complex and, next, the essential facts of the cases presented for review.
 
 
 3
 The Immigration and Nationality Act of 1952, 8 U.S.C. Sec. 1101 et seq. (1982) (Immigration Act or Act), delegates responsibility for regulating the entry of aliens jointly to the Attorney General, the Secretary of State, and United States consular officials abroad. The Secretary of State has the authority to revoke visas, as well as the general responsibility to supervise the issuance of visas by consular officers. See id. at Sec. 1104; Brief for Appellees at 4. Section 1182(a) of the Act defines the categories of aliens that the government may exclude from this country. Some of these categories deal with the status of the alien, see, e.g., Sec. 1182(a)(28) (aliens who are members of Communist or anarchist organizations); others concern the alien's activities, see, e.g., Sec. 1182(a)(29) (aliens likely to engage in subversion or espionage); while still others involve the procedural requirements for entry, see, e.g., Sec. 1182(a)(20) (aliens without valid visas and passports).
 
 
 4
 Subsection (27) of section 1182(a), the provision centrally at issue in this case, directs the exclusion of an alien if the Attorney General has reason to believe that the alien "seek[s] to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest or endanger the welfare, safety, or security of the United States." Pursuant to State Department policy, when a consular officer abroad receives a visa request from an individual he believes may be ineligible under subsection (27), the officer forwards the request to the State Department where the appropriate officials consider it and render binding advice. See 22 C.F.R. Sec. 41.130(c) (1985); Brief for the Appellees at 6-9.[1] If the alien is found to be within the subsection (27) classification, his exclusion is mandatory.
 
 
 5
 Subsection (28) of section 1182(a) also bears importantly on this case and was inadequately evaluated by the district court. This subsection authorizes the exclusion, inter alia, of aliens who are, or at any time have been, "members of ... the Communist Party of the United States, ... the Communist ... party ... of any foreign state, or ... any ... affiliate ... of any such ... party." 8 U.S.C. Sec. 1182(a)(28)(C) (1982). Unlike subsection (27), subsection (28) does not require the Secretary of State to exclude any alien who meets the stated criteria. If the Secretary recommends a waiver of ineligibility, then, in the discretion of the Attorney General, the alien may be admitted. See 8 U.S.C. Sec. 1182(d)(3)(A) (1982).
 
 
 6
 The McGovern Amendment, 22 U.S.C. Sec. 2691 (1982), addresses the Secretary's implementation of this waiver provision. The Amendment calls upon the Secretary to recommend "the approval necessary for the issuance of a visa" to "any alien who is excludible from the United States by reason of membership in or affiliation with a proscribed organization but who is otherwise admissible to the United States," unless the Secretary certifies to the Congress that "the admission of such alien would be contrary to the security interests of the United States." Id. at Sec. 2691(a).
 
 
 7
 This appeal involves three actions consolidated in the district court; the actions contest the denial under subsection (27) of four visa requests. In Abourezk v. Reagan, No. 84-5673, the plaintiffs are a diverse group of United States citizens--including members of Congress, university professors, journalists, and religious leaders--who had invited Tomas Borge, the Interior Minister of Nicaragua, to speak to them in this country. See Brief of Plaintiffs-Appellants at 9-11. The Nicaraguan government applied to the United States Embassy in Managua for a non-immigrant visa for Borge. After obtaining an advisory opinion from the State Department, the consular officer informed Borge, in late November 1983, that his visa request had been denied pursuant to section 1182(a)(27) of the Immigration Act. See Brief for the Appellees at 9-11.
 
 
 8
 The plaintiffs in Cronin v. Shultz, No. 84-5708, are principally groups interested in nuclear disarmament who had invited Nino Pasti to attend and speak at a rally in Boston. Pasti is a former member of the Italian Senate and former general in the Italian armed forces; he is now a peace activist. See Brief of Plaintiffs-Appellants at 8. Pasti is also a participant in the World Peace Council, an organization which the State Department believes to be controlled by the Soviet Communist Party. See World Peace Council: Instrument of Soviet Foreign Policy, FOREIGN AFFAIRS NOTE (Department of State, April 1982), reprinted in Joint Appendix at 144-48. The consular officer in Rome found Pasti ineligible to receive a visa under subsection (28). The officer therefore requested an advisory opinion from the State Department on the possibility of a waiver. In response, the Department informed the officer that Pasti was ineligible under subsection (27). The consular officer thereupon notified Pasti, in mid-October 1983, that his visa request had been denied. See Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 163-64.
 
 
 9
 In City of New York v. Shultz, No. 84-5681, the plaintiffs, the New York City Commission on the Status of Women and several women's studies programs at various universities, had extended speaking invitations to two Cuban women, Olga Finlay and Leonor Rodriguez Lezcano; these individuals have special expertise regarding the status of women and family law in Cuba. See Brief of Plaintiffs-Appellants at 13-14. According to the State Department, both women are members of the Federation of Cuban Women, an organization affiliated with the Communist Party of Cuba. See Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 164-65. Visa applications for the two women were conveyed by diplomatic note from the Government of Cuba. The consular officer in Havana forwarded the visa requests to the State Department and was advised that Finlay and Lezcano were ineligible under subsection (27). He notified them, in early October 1983, that their visa requests had been denied. See Brief for the Appellees at 12-13.[2]
 
 
 10
 The plaintiffs filed suit in the district court requesting injunctive and declaratory relief. They argued that the State Department's exclusion of the aliens invited by plaintiffs to speak here exceeded the Department's statutory authority under subsection (27) and violated the plaintiffs' first amendment right to engage in dialogue with these foreign individuals. The district court granted the defendants' request for a stay of discovery pending their filing of a motion for summary judgment. See Abourezk v. Reagan, No. 83-3739 (D.D.C. Feb. 8, 1984) (order granting motion for extension of time and protective order staying discovery). After consideration of both the public documents and three classified affidavits submitted by the government for the court's in camera inspection, the district judge granted the defendants' motion for summary judgment. The court held that the government's action was within its statutory authority and survived the very limited constitutional scrutiny appropriate in a case concerning the admission or exclusion of aliens. See Abourezk v. Reagan, 592 F.Supp. 880 (D.D.C.1984).
 
 II.
 
 11
 The government raises several preliminary objections to the adjudication of these claims. The State Department suggests that the district court lacked jurisdiction over the subject matter, that the plaintiffs have no right to contest the visa denials on statutory grounds, and that the case is moot. We find these contentions insubstantial.
 
 
 12
 The district court had subject matter competence in this case under both its general federal question jurisdiction, see 28 U.S.C. Sec. 1331 (1982), and its specific jurisdiction over claims arising under the Immigration and Nationality Act, see 8 U.S.C. Sec. 1329 (1982). Section 1329 states that "[t]he district courts ... shall have jurisdiction of all causes, civil and criminal, arising under any of the provisions of this subchapter [of the Immigration Act]." Section 1182(a)(27) is part of the relevant subchapter. The courts have reasonably inferred from this broad grant of jurisdiction that "clear and convincing evidence" of a congressional intent to preclude judicial review is lacking. See Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) (stating, as the general rule, presumption in favor of judicial review of final agency action, absent "clear and convincing evidence" of congressional intent to the contrary); see, e.g., Karmali v. Immigration and Naturalization Service, 707 F.2d 408, 409-10 (9th Cir.1983) (interpreting Sec. 1329 as grant of jurisdiction over Immigration Act claims); Acosta v. Gaffney, 558 F.2d 1153, 1156 (3d Cir.1977) (same).
 
 
 13
 We further note, as did the district court, see Abourezk, 592 F.Supp. at 883 n. 10, the Supreme Court's disposition on the merits in Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). In that case, United States sponsors of a Belgian journalist objected to his exclusion under section 1182(a)(28). Presumably, had the Court harbored doubts concerning federal court subject matter jurisdiction in Mandel, it would have raised the issue on its own motion. See, e.g., Louisville & Nashville R.R. v. Mottley, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908).
 
 
 14
 The government also argues that the plaintiffs' statutory pleas may not be entertained; this argument blends objections to plaintiffs' standing and to their ability to state a claim for relief (cause of action). The Immigration Act, we agree, does not itself endow plaintiffs with a right of action.[3] But the Administrative Procedure Act, 5 U.S.C. Sec. 701 et seq. (1982) (APA), which complements statutes controlling agency behavior, does. Section 702 of that Act, as explained by the Supreme Court in Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 152-53, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970), authorizes suit by persons who suffer "injury in fact" by reason of the challenged agency action and are "arguably within the zone of interests to be protected or regulated" under a relevant statute.[4]
 
 
 15
 Persons who are not materially affected by an agency's interpretation of the governing law may not successfully invoke the APA to achieve court review. See, e.g., Capital Legal Foundation v. Commodity Credit Corporation, 711 F.2d 253, 259-60 (D.C.Cir.1983). But the plaintiffs in this case are hardly strangers to the matter at issue. Unquestionably, they are "aggrieved" by the State Department's resort to section 1182(a)(27) to keep out people they have invited to engage in open discourse with them within the United States. See Brief for the Appellees at 20 ("Refusing visas to their alien invitees undoubtedly inhibits plaintiffs' rights to communicate with these individuals in face-to-face discussions on American soil."). The plaintiffs are substantively interested in, and adversely affected by, the Department's interpretation of subsection (27) as it coexists with subsection (28). They are, as the district court observed, at least arguably within the zone regulated by the statute. See Abourezk, 592 F.Supp. at 884 n. 10.[5] They therefore have a cognizable stake in the construction of subsections (27) and (28), a practical interest adequate under section 702 of the APA to secure judicial review of their pleas regarding those provisions. Cf. Capital Legal Foundation, 711 F.2d at 259-60 & n. 17.
 
 
 16
 Section 701 of the APA states that "[t]his chapter applies, according to the provisions thereof, except to the extent that--(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. Sec. 701 (1982). As discussed above, the Immigration Act, far from precluding review, affirmatively provides for it. See supra at 1049-50.[6] Furthermore, the statute does not commit to unguided agency discretion the decision to exclude an alien. The Supreme Court has recently interpreted the "committed to unfettered agency discretion" provision as applicable only "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, --- U.S. ----, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Under this interpretation, the Immigration Act emphatically did not commit the decision to exclude an alien to standardless agency discretion; the statute lists thirty-three distinctly delineated categories that conspicuously provide standards to guide the Executive in its exercise of the exclusion power. See 8 U.S.C. Sec. 1182(a) (1982). The statutory language thus channels the Secretary of State's discretion and, under Heckler v. Chaney, the constraints Congress imposed are judicially enforceable.
 
 
 17
 In sum, the APA applies to the plaintiffs' challenges; that Act gives them a right of review extending to the statutory as well as the constitutional propriety of the State Department's application of section 1182(a)(27) to exclude the aliens invited by plaintiffs to the United States as speakers and meeting participants. We add, finally, that in the special circumstances of this case, the court has an independent obligation to consider questions of statutory construction. We should so proceed in order to avoid a constitutional confrontation, if it is possible for us to stop short of that point. See Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). This consideration strongly supports our attention to the plaintiffs' nonconstitutional arguments. We should not reach "[the] constitutional question although properly presented by the record, if there is also present [a statutory construction] ground upon which the case may be disposed of." Id. In rejecting the government's demand that we confine review to the consistency of the State Department's actions with the Constitution, we thus observe the "cardinal principle" directing a court first to inquire "whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." Id. at 348, 56 S.Ct. at 483 (quoting Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed 598 (1932)).
 
 
 18
 Turning to the last of the government's threshold objections, we hold that the case is not moot. The government asserts that the State Department considers each visa application independently and that the present denials in no way bear on the results of any future application that the excluded aliens might make. See Brief for the Appellees at 26 n. 23; Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 158. However, the reasons for the visa denials offered by the State Department and accepted by the district court indicate that the prospect of future denials of applications by these aliens is a genuine, and not merely a "theoretical[,] possibility." Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982).
 
 
 19
 The State Department's dominant reasons for the denials that sparked this litigation do not refer to a particular event in the world whose cessation might induce the government to grant visa requests from the aliens whom plaintiffs invited to speak. Instead, the Department cites the continuing status of these aliens as members of organizations or governments hostile to the United States.[7] The aliens, whose affiliations apparently have not changed, assert that their interest in entering the United States continues, and the plaintiffs have represented that they still wish to invite these aliens to speak in this country. See Brief of Plaintiffs-Appellants at 9 (Pasti), 13 (Borge), 17 (Finlay and Lezcano). In light of the reasons for the visa denials tendered by the government and relied upon by the district court, these allegations of continuing interest suffice to establish a genuine prospect that the plaintiffs will suffer the same injury in the future. See Nebraska Press Association v. Stuart, 427 U.S. 539, 546-47, 96 S.Ct. 2791, 2796-97, 49 L.Ed.2d 683 (1976).[8] We therefore reach the merits of the plaintiffs' claims.III.
 
 
 20
 The plaintiffs raise three issues of statutory interpretation. They argue, first, that subsection (27) does not authorize exclusion on the basis of foreign policy concerns, as opposed to issues of "public interest or ... [national] welfare, safety, or security...." 8 U.S.C. Sec. 1182(a)(27) (1982). Second, the plaintiffs contend that subsection (27) allows exclusion only if it appears that the alien's activities in the United States would endanger the public welfare and not if his or her mere presence or entry might do so. And, third, the plaintiffs suggest that the government's interpretation of subsection (27) violates the statute because it renders subsection (28) superfluous and undermines the restrictions Congress has placed on the Executive's use of subsection (28). See McGovern Amendment, 22 U.S.C. Sec. 2691 (1982).
 
 
 21
 Our approach to statutory interpretation is informed by the guidelines the Supreme Court announced in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). According to Chevron, a court must first examine the statutory provision in question to determine whether Congress had a specific intent with respect to the issue at hand. See id. 104 S.Ct. at 2781. This examination should begin with the language of the statute, see Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), but the court may also inspect legislative history and past administrative practice for any light these sources may shed on congressional intent. See, e.g., Chevron, 104 S.Ct. at 2791-92; Rettig v. Pension Benefit Guaranty Corporation, 744 F.2d 133, 144-50 (D.C.Cir.1984). If the court finds that Congress had a specific intent with respect to the issue, the court stops there and enforces that intent regardless of the agency's interpretation. See Chevron, 104 S.Ct. at 2781-82 & n. 9. If, however,the court finds that Congress had no specific intent, the agency's interpretation should be accorded great deference and invalidated only if it is not a "reasonable accommodation of conflicting policies that were committed to the agency's care by the statute...." Chevron, 104 S.Ct. at 2783 (quoting United States v. Shimer, 367 U.S. 374, 382-83, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).
 
 
 22
 Following these guidelines, we conclude, in agreement with the government and the district court, see Abourezk, 592 F.Supp. at 885-86, that Congress intended foreign policy concerns to rank among the national interests whose protection would justify exclusion of an alien under subsection (27). The broad language of (27) evinces no intent to restrict the kinds of governmental concerns that would qualify; the subsection speaks of "public interest[,] ... welfare, safety, or security" and places no limitation on these encompassing terms. Only an isolationist view patently inconsistent with the reality of our late twentieth century world could account for a belief that the "public interest" and the "national welfare" were not dependent, in part, on the effective execution of our foreign policy. The court surely should not adopt on its own initiative such a counter-intuitive interpretation of expansive statutory language, and the plaintiffs have identified nothing in the legislative history or administrative practice to suggest that Congress intended to exclude foreign policy concerns from consideration under subsection (27). Because the State Department's interpretation appears fully consistent with congressional intent, we need take this inquiry no further.
 
 
 23
 The plaintiffs also contend that subsection (27) explicitly authorizes exclusion based only on "activities" in which the alien may be expected to "engage" and not on mere entry or presence. The district court decided this issue for the government. See Abourezk, 592 F.Supp. at 884-85. We conclude that it did so on an inadequate record. We therefore remand for a fuller airing of the activity/mere entry question.
 
 
 24
 The language of the statute, as the Dissent acknowledges, supports the plaintiffs' interpretation on this issue. Dissent at 9. The provision does not say "persons whose presence in this country would be prejudicial to the interests of the United States are barred from entry." Rather, subsection (27) makes ineligible for a visa those aliens who "seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial" to United States interests. The specific reference to activities would be superfluous, indeed, misleading, if entry or presence alone could justify exclusion. A familiar canon of statutory construction cautions the court to avoid interpreting a statute in such a way as to make part of it meaningless. See 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION Sec. 46.06 (4th ed.1984). This basic guide and the plain thrust of the language of subsection (27), we emphasize, weigh heavily against the government's reading.
 
 
 25
 The terms Congress employed in other subsections on exclusion are also consistent with plaintiffs' interpretation. Section 1182(a) sets out thirty-three separate categories of excludable aliens; this enumeration demonstrates that Congress could and did clearly distinguish status-based categories from conduct-based categories. See supra at 1047. Congress' undoubted ability to draft categories based only on status, when that is the legislature's intention, strengthens the inference that the words "to engage in activities" contained in subsection (27) were not put there inadvertently.
 
 
 26
 The legislative history on this issue, however, is not a prop upon which plaintiffs can rely. It is terse and tugs in more than one direction. The language of section 1182(a)(27) of the 1952 Immigration Act was taken almost verbatim from section 22 of the Internal Security Act of 1950, 64 Stat. 987, 1006 (repealed 1952). The Senate Reports on section 22 seem to assume that both existing law and the proposed section allowed exclusion when the very entry of the alien would be prejudicial to the public interest.[9] The Conference Committee Report, on the other hand, implies that existing law and section 22 authorize exclusion only on the basis of activities.[10]
 
 
 27
 Given the inconclusive state of the legislative history,[11] evidence of congressional acquiescence (or the lack thereof) in an administrative construction of the statutory language during the thirty-four years since the current act was passed could be telling. Information about such acquiescence, or the absence of it, would rank as a significant indicator of the legislature's will. See Zemel v. Rusk, 381 U.S. 1, 8-12, 85 S.Ct. 1271, 1276-1279, 14 L.Ed.2d 179 (1965).[12] Unfortunately, evidence on this point was thin when the district court determined to accept the State Department's interpretation, for that court had stayed discovery pending the government's motion to dismiss. See Abourezk v. Reagan, No. 83-3739 (D.D.C. Feb. 8, 1984). The only evidence of administrative practice now in the record consists of conflicting assertions in the affidavits of past and present State Department officials and a sparse collection of illustrations. Compare Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 159-60 (present Deputy Assistant Secretary of State), with Affidavit of Leonard C. Meeker, reprinted in Joint Appendix at 252 (former Legal Adviser to the Department of State).
 
 
 28
 The illustrations--advanced by the State Department as indicative of an administrative practice of excluding aliens under subsection (27) based on entry or presence alone--include descriptions of three actual visa denials and four examples listed in the State Department Manual. While these illustrations provide some support for the government's position, they are inadequate to enable a court to determine reliably the nature of the general administrative practice under subsection (27).
 
 
 29
 The Manual offers the following examples of aliens whose visa applications might properly be denied under (27): an alien who might engage in conspiratorial activity against the United States while in the country; an alien who is known to be a member of a terrorist organization; an alien who is associated with a criminal organization; and an alien official who engaged in physical brutality while in power or was associated with a regime that did so. See Brief of Plaintiffs-Appellants at 37 (citing FOREIGN AFFAIRS MANUAL, Pt. II, Sec. 41.91(a)(27), reprinted in 6 C. GORDON & H. ROSENFELD, IMMIGRATION LAW AND PROCEDURE 32-214.18 (1985)). Although the first three examples may be explained in terms of the aliens' probable activity in the United States, the last example, the government argues, embodies the State Department's longstanding view that exclusion under subsection (27) is appropriate when the mere entry of the alien would prejudice foreign policy objectives. In that example, the government is concerned, not about the possibility that the official might engage in physical brutality while in the United States, but about the impact of the very admission of such a person on our foreign policy interests. See Brief for the Appellees at 56 n. 42. This fourth example in the Manual may represent an open assertion of the power to exclude under subsection (27) on the basis of entry alone; such an assertion of authority may warrant the implication of an executive policy, even if the policy is only infrequently applied, and may contribute to a showing of congressional acquiescence in that policy. See Haig v. Agee, 453 U.S. 280, 303, 101 S.Ct. 2766, 2780, 69 L.Ed.2d 640 (1981).
 
 
 30
 The State Department also offers three instances of actual visa denials that were allegedly based on entry rather than activity and were reported to various members of Congress and committees. In two of the cases the reasons for denial included references to the alien's anticipated activities in the United States. See Second Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 306, 308.[13] In the third case, however, the State Department appears to have applied the fourth example in the Manual: in that case, former Nazi SS officer Otto Skorzeny was denied a visa under subsection (27) for foreign policy reasons. See id. at 306. Thus, there seems to be at least one instance, of which Congress was apprised, in which the State Department actually applied the interpretation of subsection (27) that the government presses in this litigation.
 
 
 31
 This meager evidence does not demonstrate the kind of consistent administrative interpretation necessary to give rise to a presumption of congressional acquiescence. See Kent v. Dulles, 357 U.S. 116, 128, 78 S.Ct. 1113, 1119, 2 L.Ed.2d 1204 (1958) (holding that "scattered rulings ... not consistently of one pattern" are an insufficient basis on which to impute congressional intent). The examples cited by the State Department, in conjunction with the inconclusive legislative history, however, do cast some doubt on the plaintiffs' interpretation, an interpretation that otherwise seems indicated by the language of the statute. In order to weigh the relative persuasiveness of the two interpretations, the district court needed more information.[14] It should have asked the government to come forward with further examples of the exercise or assertion of power to exclude under subsection (27) on the basis of presence alone; and, in fairness, it should have allowed the plaintiffs sufficient discovery to contest those examples and provide counter-examples.[15]
 
 
 32
 Without thus developing a more substantial record, the district court could not make a secure finding concerning the nature of the administrative practice under subsection (27). And without such a finding, given the inconclusive state of the legislative history and the strength of the plaintiffs' textual argument, the district court's decision in favor of the government's interpretation was premature. We therefore set aside the district court's holding on this issue and remand for the fuller proceedings appropriate prior to resolution of this question of statutory interpretation.
 
 
 33
 The plaintiffs also contend that the government's interpretation of subsection (27) violates the statute because it effectively swallows up subsection (28) and thereby nullifies the restrictions placed by the McGovern Amendment on the use of the latter subsection. We find this argument persuasive. The Executive may not use subsection (27) to evade the limitations Congress appended to subsection (28).
 
 
 34
 The McGovern Amendment calls upon the Secretary of State to recommend a waiver of ineligibility, and thereby open the way for admission of an alien who belongs to a subsection (28) organization, unless the Secretary certifies to the Congress that admission of the alien would "be contrary to the security interests of the United States...." 22 U.S.C. Sec. 2691(a) (1982). The district judge in this case found that prejudice to foreign policy did not qualify as a "security interest" within the meaning of the McGovern Amendment. See Abourezk, 592 F.Supp. at 855; accord Allende v. Shultz, 605 F.Supp. 1220, 1225 n. 2 (D.Mass.April 2, 1985). The State Department itself appears to have reached the same conclusion. See Brief of Plaintiffs-Appellants, app. B at 2 (letter from Alvin Paul Drischler, Acting Assistant Secretary of State, to George Bush, President of the United States Senate (Oct. 18, 1983)) ("The result [of the McGovern Amendment] has been that the Secretary of State is effectively precluded from acting in such cases on the basis of legitimate foreign policy factors and considerations.").
 
 
 35
 If the government could use subsection (27) to exclude aliens whose entry might threaten our foreign policy objectives simply because of their membership in Communist organizations, then subsection (28) would be made superfluous and the congressional will expressed in the McGovern Amendment would be nullified. Conversely, the restrictions on subsection (28) must not be read in a fashion that would rob subsection (27) of its independent scope and meaning. To preserve the significance of both sections, and the congressional intent that guided their adoption, the two sections must not be homogenized or treated as interchangeable parts. See Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973) (holding that courts must interpret statutes in such a way as to give effect to all of their provisions).[16]
 
 
 36
 The government argues that it has distinguished the two sections by using (27) only when it has a reason for exclusion in addition to the alien's membership in an organization listed in (28). See Transcript of Proceedings at 38-40, Abourezk v. Reagan, No. 84-5673 (D.C.Cir.Sept. 23, 1985). This standard, however, is inadequate to prevent subsection (27) from overwhelming and obliterating subsection (28) and the McGovern Amendment. A reason that is in addition to the fact of membership but not independent of that fact provides an insufficient bulwark against the possibility of Executive evasion of the will of Congress as expressed in the McGovern Amendment.
 
 
 37
 For example, the broadest generalization about the character or activities of members of a group would be a reason in addition to the bare fact that a particular alien belonged to that group. But to exclude an alien based on the perceived bent or proclivities of members of a subsection (28) organization would contravene the core purpose of the McGovern Amendment. The Amendment was intended to implement the United States' promise under the Helsinki Accords[17] to promote the free flow of people and ideas across national borders. See 22 U.S.C. Sec. 2691(a) (1982); S.REP. No. 194, 95th Cong., 1st Sess. 13 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1625, 1635. The Amendment fulfills that commitment by assuring that a would-be speaker is not condemned by association with a subsection (28) organization[18] if he is "otherwise admissible." 22 U.S.C. Sec. 2691(a) (1982). A visa denial based on a generalization about the members of a subsection (28) group surely qualifies as the brand of guilt by association Congress sought to check. No reason particular to this alien or to this moment in time distinguishes such a denial; the denial is appropriate for all members at all times because it is simply a condemnation of the group as a whole.[19]
 
 
 38
 We hold that when an alien is a member of a proscribed organization, so that subsection (28) applies, the government may bypass that provision and proceed under subsection (27) only if the reason for the threat to the "public interest[,] ... welfare, safety, or security" is independent of the fact of membership in or affiliation with the proscribed organization. Only if such an independent reason exists will the use of subsection (27) leave intact the congressionally mandated restrictions on subsection (28).[20]
 
 
 39
 The Dissent finds sufficient reason, separate from the applicants' membership in proscribed organizations, for upholding the government's action under subsection (27). This reason consists of alleged affiliations of the visa applicants with particular governments hostile to the United States (the governments of Nicaragua, the Soviet Union, and Cuba). See Dissent at 1069-71. We do not reject affiliation with a particular foreign government as beyond the pale of subsection (27). However, if the alleged government affiliation is presumed because of the applicant's membership or participation in a subsection (28) organization, we would not count that presumption as independent of the organizational tie. In other words, if all members of a proscribed organization were automatically branded "affiliates" of a certain government, that branding would be no more independent of the fact of membership than the generalization about the character or activities of group members to which we earlier referred. See supra at 1057-58.[21] On the other hand, if the State Department pinpoints the alien's official post or action as an official representative of a hostile government as the reason for the exclusion under subsection (27) on foreign policy grounds, then the "independent of" organizational membership standard would be met.[22]
 
 
 40
 The State Department, however, has so far obscured its position. It mentioned both subsection (28) organizational affiliations and connections between the visa applicants and certain foreign governments. See, e.g., Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 162-65. But at the same time, the Department volunteered that earlier in the same year (1983), during Borge's incumbency as Interior Minister of Nicaragua, a visa application for his travel to the United States had been approved. Id. at 166. Similarly, the Department represented that both Finlay and Pasti "have previously received [non-immigrant visas] and travelled to the United States." Id. In short, the Department has never squarely advanced as the rationale for exclusion the applicants' government ties rather than their subsection (28) organization membership.[23] Instead, it has taken an "either/or" stance. See Abourezk, 592 F.Supp. at 888 (in camera affidavits show that applicants were denied entry "because of their personal status as officials of governments or organizations which are hostile to the United States") (emphasis supplied).
 
 
 41
 If we were to deem it sufficient, as the Dissent does, for the State Department so to rest on pleas in the alternative, we would shirk our obligation to enforce the congressional direction, which the Dissent acknowledges, see Dissent at 14, to pay genuine heed to the McGovern Amendment. The Department, as the agency charged by Congress with the administration of the statute, of course would retain authority initially to frame criteria for determining when a sufficiently independent reason exists to warrant invocation of subsection (27). The Department's criteria must be clear enough to allow the courts to fulfill their responsibility to insure that the executive authority respects congressional intent, but the precise contours of the "independence inquiry" should be left, in the first instance, to the sound and expert judgment of the State Department. We therefore remand the three consolidated cases so that both the district court and the government may reevaluate these visa denials without the statutory misinterpretation that casts doubt on their previous analyses.[24]
 
 IV.
 
 42
 We note our grave concern about the district court's heavy reliance upon in camera ex parte evidence when it granted the defendants' motion for summary judgment. That court evaluated the public documentation as "entirely conclusory" and inadequate; it thereupon turned to the classified affidavits and asserted that it found in them information justifying its final disposition. See Abourezk, 592 F.Supp. at 886-87. We caution the district court, in the further proceedings this opinion requires, to make certain that plaintiffs are accorded access to the decisive evidence to the fullest extent possible, without jeopardizing legitimately raised national security interests.
 
 
 43
 It is a hallmark of our adversary system that we safeguard party access to the evidence tendered in support of a requested court judgment. The openness of judicial proceedings serves to preserve both the appearance and the reality of fairness in the adjudications of United States courts. It is therefore the firmly held main rule that a court may not dispose of the merits of a case on the basis of ex parte, in camera submissions. See In re Application of Eisenberg, 654 F.2d 1107, 1112 (5th Cir.1981).
 
 
 44
 Exceptions to the main rule are both few and tightly contained. Most notably, inspection of materials by a judge isolated in chambers may occur when a party seeks to prevent use of the materials in the litigation. When one side, seeking to block consideration of relevant matter, asserts an evidentiary privilege, the court may inspect the evidence in camera and alone for the limited purpose of determining whether the asserted privilege is genuinely applicable. See id. If the court finds that the claimed privilege does not apply, then the other side must be given access to the information; if the court's finding is that the privilege does apply, then the court may not rely upon the information in reaching its judgment. See Ellsberg v. Mitchell, 709 F.2d 51, 64 (D.C.Cir.1983), cert. denied sub nom. Russo v. Mitchell, 465 U.S. 1038, 104 S.Ct. 1316, 79 L.Ed.2d 712 (1984). In either case, no party will be faced--as were the plaintiffs in this case--with a decision against him based on evidence he was never permitted to see and to rebut.
 
 
 45
 Only in the most extraordinary circumstances does our precedent countenance court reliance upon ex parte evidence to decide the merits of a dispute. Our one case in point, Molerio v. Federal Bureau of Investigation, 749 F.2d 815 (D.C.Cir.1984), involved the state secrets privilege, a privilege not invoked in this case. The government pressed acute national security concerns in Molerio, and we recognized a large risk that an unjust result would eventuate if the case proceeded without the privileged material. See id. at 825. While we allowed court recourse to the confidential information in Molerio, we based that allowance upon proper invocation of the privilege; a demonstration of compelling national security concerns; and public disclosure by the government, prior to any in camera examination, of as much of the material as it could divulge without compromising the privilege. In addition, the plaintiff in Molerio had been accorded considerable discovery of non-privileged materials. See id. at 819; see also Ellsberg, 709 F.2d at 63-64.
 
 
 46
 We mention finally a third class of cases in which in camera inspection may occur: exceptions to the main rule specified by statute. The prime current example is the Freedom of Information Act, 5 U.S.C. Sec. 552 (1982). Even in administering such legislation, however, we have been vigilant to confine to a narrow path submissions not in accord with our general mode of open proceedings. See, e.g., Vaughn v. Rosen, 484 F.2d 820, 827-28 (D.C.Cir.1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974) (requiring the government to create a public index listing privileged documents and providing explanations of the claim of privilege). No statutory scheme permitting closeted inspection of evidence is implicated in this case.
 
 
 47
 In sum, we expect the district court, on remand, to be mindful of the tight boundaries set in Molerio and of the overriding importance of assuring plaintiffs' receipt of the most complete information and explanation permissible.
 
 V.
 
 48
 The Executive has broad discretion over the admission and exclusion of aliens, but that discretion is not boundless. It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie.
 
 
 49
 Congress, in the legislation at issue, has specified categories of excludable aliens and has qualified the application of one of those categories through the passage of the McGovern Amendment. The State Department must respect the restraints Congress imposed. The district court's conclusion that the congressionally prescribed boundaries had not been transgressed was insufficiently grounded; the court proceeded to judgment without the exploration of administrative practice necessary to an informed decision and it did not adequately advert to the relationship between two statutory provisions. We therefore vacate the district court's judgment. We remand the three consolidated cases for reexamination of the visa denials in question to insure that the challenged government action is within the statutory and constitutional authority of the State Department.
 
 
 50
 Judgment vacated and cases remanded for proceedings consistent with this opinion.
 
 BORK, Circuit Judge, dissenting:
 
 51
 In these consolidated cases, we review the denial of non-immigrant visas to four applicants who wish to enter the United States--Thomas Borge, Nino Pasti, Olga Finlay, and Leonor Rodriguez Lezcano. The plaintiffs are American citizens who wish to meet with these applicants if they are permitted to enter the United States.
 
 
 52
 Each of these applications was denied pursuant to 8 U.S.C. Sec. 1182(a)(27) (1982), which requires exclusion of aliens who "the consular officer or the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States." Thomas Borge is the Interior Minister of Nicaragua and a member of the National Directorate of the Sandinista Front for National Liberation. Nino Pasti, formerly a member of the Italian Senate, is an active participant in the World Peace Council, which the State Department characterizes as an instrumentality of the Soviet Union. Olga Finlay and Leonor Lezcano are officials of the Federation of Cuban Women, which, according to the State Department, is controlled by the Cuban Communist Party. Finlay has served as the Cuban representative to the United Nations Commission on the Status of Women. According to the American official who received their applications, both women were the bearers of Cuban diplomatic passports, and their visa applications were conveyed via diplomatic note from the government of Cuba. Affidavit of Louis P. Goelz, Joint Appendix ("J.A.") at 153-67. The United States government determined that the entry of these applicants would be prejudicial to the public interest, and declined to grant them visas.
 
 
 53
 Plaintiffs challenge these decisions--and the judgment of the district court upholding their legality--on both statutory and constitutional grounds. They assert that the Executive acted without statutory authority on three grounds: because subsection (27) does not authorize exclusion simply on the basis of foreign policy (as opposed to national security) concerns; because subsection (27) does not authorize the exclusion of an applicant when it is his mere entry, rather than the specific activities in which he intends to engage, that will be prejudicial to the public interest; and because the government's interpretation will effectively nullify 22 U.S.C. Sec. 2691 (1982) (the McGovern Amendment). The majority opinion rejects the first argument and remands on the basis of its analysis of the second and third. The majority therefore does not need to address the plaintiffs' other set of claims--that such authority, if in fact authorized by statute, is unconstitutional both as a violation of the first amendment and as inconsistent with fundamental principles of separation of powers.
 
 
 54
 While I agree that we have jurisdiction to reach the statutory issues presented,[1] I disagree with the analysis used by the majority to resolve them, and dissent from the holding of today's decision. Because I conclude that the statute permits what the government has done, I go on to reach the constitutional challenge and conclude that it fails.
 
 I.
 
 55
 The initial issue in this case is one of statutory construction. We are governed, as the majority notes, by the principles articulated by the Supreme Court in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Court in Chevron made clear that a court "must give effect to the unambiguously expressed intent of Congress" if such intent can be gleaned from the statutory language and legislative history. Id. 104 S.Ct. at 2781-82. If, however, the statute "is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 2782. The Court went on to note that to approve an administrative construction a court "need not conclude that the agency construction was the only one it permissibly could have adopted ... or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Id. at 2782 n. 11. Therefore, where the traditional tools of statutory analysis lead to confused or contradictory interpretations, a reasonable reading of the statute given by the agency charged with its execution must be upheld.
 
 
 56
 This principle of deference applies with special force where the subject of that analysis is a delegation to the Executive of authority to make and implement decisions relating to the conduct of foreign affairs. Such authority is fundamentally executive in nature. When a court undertakes to review such decisions, it is "dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations--a power which does not require as a basis for its exercise an act of Congress." United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-20, 57 S.Ct. 216, 220-21, 81 L.Ed. 255 (1936). The Supreme Court has described the exclusion of aliens as "a fundamental act of sovereignty," stating that "the right [to exclude] stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." Knauff v. Shaughnessy, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). Therefore, in its delegations of power in the area of foreign relations, Congress "must of necessity paint with a brush broader than that it customarily wields in domestic areas," Zemel v. Rusk, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965), and "[p]ractically every volume of the United States Statutes contains one or more acts ... of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." United States v. Curtiss-Wright Export Corp., 299 U.S. at 324, 57 S.Ct. at 223. The Immigration and Nationality Act is one such statute; it mandates exclusion in thirty-two separate categories, while preserving in subsection (27), in the broadest of terms, the authority of the Executive to order additional ones.
 
 
 57
 I have discussed these basic principles at the outset because I do not believe the majority opinion gives them appropriate weight, either when it requires the government to come forward with further examples of prior administrative construction, or when it adopts an overly restrictive interpretation of the McGovern Amendment in order to prevent the Executive from "evading" the terms of that provision.
 
 II.
 
 58
 The majority remands this case to the district court so that more information may be gathered to resolve conflicting claims over prior administrative interpretations of subsection (27). I believe the remand, and the further inquiry, to be unnecessary. The issue around which these claims revolve--whether subsection (27) authorizes denial of a nonimmigrant visa when only the applicant's entry or presence, as opposed to his specific activities, are deemed prejudicial to the public interest--is one that can be fairly resolved on the basis of the legislative history and the record now before us, and I see little to be gained through the taking of further evidence. The legislative reports accompanying subsection (27) and earlier enactments--the present provision traces its lineage to laws passed in 1950 and 1941--made clear that when the entry, presence, or admission of an applicant would be prejudicial to the public interest, that applicant would be ineligible to receive a visa.
 
 
 59
 When Congress enacts a new statute that repeats the language contained in an older statute, there is a heavy presumption that Congress meant the same thing in each, particularly when the new statute is in part a codification of existing law. See Doe v. diGenova, 779 F.2d 74, 82 (D.C.Cir.1985); Stribling v. United States, 419 F.2d 1350, 1352-53 (8th Cir.1969). Accord 2A N. Singer, Sutherland Statutory Construction Sec. 53.03, at 554 (Sands 4th ed. 1984). That is the situation with respect to subsection (27).
 
 
 60
 The Senate and House Reports accompanying the current law, the Immigration and Nationality Act of 1952, indicate that section 1182(a)(27)-(29) incorporated the parallel provisions of the Internal Security Act of 1950, ch. 1024, 64 Stat. 987, along with certain revisions. H.R.Rep. No. 1365, 82d Cong., 2d Sess. 30 (1952), U.S.Code Cong. & Admin.News 1952, p. 1653; S.Rep. No. 1137, 82d Cong., 2d Sess. 10 (1952). Section 1182(a)(27) was derived from section 22 of the Internal Security Act of 1950, which had excluded from admission:
 
 
 61
 [a]liens who seek to enter the United States whether solely, principally, or incidentally, to engage in activities which would be prejudicial to the public interest, or would endanger the welfare or safety of the United States....
 
 
 62
 64 Stat. 1006 (amending Act of Oct. 16, 1918, 40 Stat. 1012, 8 U.S.C. Sec. 137 (1946)). The Immigration and Nationality Act retained that language in its entirety, revising it only by changing "welfare or safety" to "welfare, safety, or security."
 
 
 63
 As the majority notes, the Senate Report accompanying the Internal Security Act described this paragraph as:
 
 
 64
 an admixture of existing law and the new provisions of the bill. Under existing law, among the excludable aliens are certain aliens who seek to enter the United States whose entry would be prejudicial to the public interest or would endanger the safety of the United States. The committee has broadened this class of excludable aliens to include those aliens who seek to enter the United States to engage in activities which would endanger the welfare of the United States.
 
 
 65
 S.Rep. No. 2369, 81st Cong., 2d Sess. 10 (1950) (emphasis added); accord S.Rep. No. 2230, 81st Cong., 2d Sess. 5 (1950). The Internal Security Act, therefore, was explicitly described as including and broadening existing provisions prohibiting prejudicial entry. This is not a counterintuitive interpretation; it would be surprising if Congress meant to bar aliens who would engage in prejudicial activities, but admit those whose very entry would be prejudicial to the public interest.
 
 
 66
 The Immigration and Nationality Act incorporated this language, and this interpretation as well. In one of its few specific references to subsection (27), the accompanying Senate Report made mention of:
 
 
 67
 an alien [who] appears to be excludable under paragraph (27), (28) or (29) of section 212(a) as an alien whose entry would endanger the public safety or security of the United States or as an alien who is a member of one of the subversive classes of excludables....
 
 
 68
 S.Rep. No. 1137, supra, at 27 (emphasis added).
 
 
 69
 This was the interpretation given this language by a prior Congress as well. The language of subsection (27) had its origin in a bill enacted in 1941, which provided:
 
 
 70
 [t]hat whenever any American diplomatic or consular officer knows or has reason to believe that any alien seeks to enter the United States for the purpose of engaging in activities which will endanger the public safety of the United States, he shall refuse to issue to such alien any immigration visa, passport visa, transit certificate, or other document entitling such alien to present himself for admission into the United States.
 
 
 71
 55 Stat. 252. In a number of respects, this was a more narrowly written provision than the one later enacted as 8 U.S.C. Sec. 1182(a)(27) (1982). First, it did not grant the Attorney General authority to make these determinations; he was not so authorized until an Act of Congress passed in 1948, ch. 338, 62 Stat. 268. Second, the 1941 language referred only to activities endangering the "public safety," while the Immigration and Nationality Act included those "prejudicial to the public interest" and dangerous to the country's "welfare" or "security" as well. Third, the bill enacted in 1941 referred simply to aliens seeking to enter the country "for the purpose of engaging in activities" thought to merit exclusion, while the Immigration and Nationality Act refers to those aliens who seek to enter "solely, principally, or incidentally to engage in [such] activities."
 
 
 72
 Despite the seemingly more restrictive statutory definition of "activities," the legislative history makes clear that the Congress that enacted the 1941 legislation saw the bill as excluding those whose entry or presence would endanger the public safety. According to the Senate Report:
 
 
 73
 The purpose of the legislation is to provide means not now afforded by law of keeping out of this country certain aliens, otherwise admissible, whose presence in the United States would be dangerous to the public safety.
 
 
 74
 S.Rep. No. 386, 77th Cong., 1st Sess. 1 (1941) (emphasis added). That Senate Report was only two pages long and relied for its explanation of the bill primarily upon two pieces of correspondence describing the legislation--one from the Attorney General, and one from the Acting Secretary of State. The letter from the Attorney General described the bill as authorizing
 
 
 75
 the refusal of visas to aliens whose entry into the United States would endanger the public safety.
 
 
 76
 Id. (emphasis added). The letter from the State Department described the bill as authorizing
 
 
 77
 the refusal of visas to aliens whose admission into the United States would endanger the public safety.
 
 
 78
 Id. at 2 (emphasis added). Similarly, the chief sponsor of the bill, Senator Russell, explained on the Senate floor that the bill
 
 
 79
 purports to confer a power on the members of the Consular Service abroad which I already thought they had. It merely permits the consuls to refuse visas to aliens whom they know or have reason to believe are persons whose presence in the United States will be inimical to the public interest.
 
 
 80
 87 Cong.Rec. 4757 (1941) (emphasis added).
 
 
 81
 It seems evident, therefore, that in making reference to "activities" in this context, Congress has done so with the understanding that the term encompasses entry and presence as well. Standing against these consistent references to "entry" is the Conference Report cited by the majority, maj. op. at 1054 n. 10, which refers to prejudicial "activities." H.R.Rep. No. 3112, 81st Cong., 2d Sess. 54 (1950), U.S.Code Cong.Serv. 1950, pp. 3886, 3906. That part of the Conference Report, however, simply recites, virtually word for word, the language of the statute itself. It provides no additional explanation or elaboration, and does not seek to describe what Congress understood those words to mean. It is the language of the statute itself, which uses the term "activities," that provides the most persuasive support for the plaintiffs' position.
 
 
 82
 Had we before us nothing but the language of the statute, without any legislative history, I might be inclined to adopt the construction proposed by the plaintiffs. The question would by no means, however, be free from doubt, for it is not at all clear--from the language alone--whether presence within this country can itself be deemed an "activity." In any event, as Justice Harlan has written, "[t]he decisions of [the Supreme] Court have repeatedly warned against the dangers of an approach to statutory construction which confines itself to the bare words of a statute, for 'literalness may strangle meaning.' " Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962) (quoting Utah Junk Co. v. Porter, 328 U.S. 39, 44, 66 S.Ct. 889, 892, 90 L.Ed. 1071 (1946)) (other citations omitted). When Congress has repeated again and again that it enacted these words with an understanding that they required the exclusion of aliens whose entry would be harmful, I think it necessary to conclude that the sharp dichotomy between "entry" and "activities" that is urged upon us is incompatible with congressional intent. And to the extent that this question is regarded as close, I find controlling both the teaching of Chevron and the deference Congress and the courts have traditionally accorded Executive determinations in matters pertaining to foreign relations.
 
 
 83
 This remand is therefore unnecessary. The majority finds it "conceivable" that the repeated references to entry in the legislative history were meant to authorize what they purported to authorize. Maj. op. at 1054 n. 11. I think it more than conceivable. But even if this repeated usage was "casual and inadvertent, not motivated or informed by the precise consideration at issue in the instant cases," id., we are still left with Chevron, which held that when Congress "has not directly addressed the precise question at issue," a court must defer to a reasonable administrative interpretation. 104 S.Ct. at 2782. I find it difficult to understand how an interpretation offered half a dozen times by Congress in the legislative history can possibly be unreasonable when adopted by officials in the executive branch. The majority may find another interpretation more plausible, but that is not the standard we are charged to apply.
 
 
 84
 The majority has not in fact determined that the interpretation was unreasonable, but believes that evidence of possible congressional acquiescence is necessary before a proper conclusion can be reached one way or the other.[2] As I have just noted, congressional acquiescence is unnecessary if the department's interpretation is reasonable. But the majority's position seems to me incorrect for a second reason. Addressing the issue of congressional acquiescence in Haig v. Agee, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981), the Supreme Court noted that
 
 
 85
 it would be anomalous to fault the Government because there were so few occasions to exercise the announced policy and practice. Although a pattern of actual enforcement is one indicator of Executive policy, it suffices that the Executive has "openly asserted" the power at issue.
 
 
 86
 Id. at 303, 101 S.Ct. at 2780 (citation omitted). That open assertion is present, in this instance, in the State Department Manual, see supra note 2.[3] Further evidence of congressional acquiescence may be hard to come by. Congress has not recodified or reenacted the immigration statute since 1952. The district court is therefore expected to infer acquiescence simply from evidence of passive congressional awareness of an existing policy, without the affirmative indication of congressional approval implied by a reenactment of the same statute without relevant revisions. Moreover, government records relating to visa requests are required by law to be kept confidential. 8 U.S.C. Sec. 1202(f) (1982). While records of three incidents of exclusion, cited by the majority, have become available--prompted by "Congressional inquiry or other public interest," Second Affidavit of Louis P. Goelz at 2, J.A. at 305--the overall policy is one of avoiding disclosure. Since Congress cannot acquiesce, or refuse to acquiesce, in a practice about which it is not generally informed, it is unlikely that the remand will produce any evidence more dispositive than that which is currently before us.
 
 
 87
 Even if the plaintiffs were able to demonstrate that their more narrow interpretation had governed Executive policy in prior years, they would still have to prove that it was an interpretation in which Congress can be said to have acquiesced. This may be difficult. Subsection (27) allows the President broad discretion in deciding which admissions would be prejudicial. If the President in the past has not exercised the full measure of the authority he now claims to possess, the mere absence of an affirmative response by Congress proves very little. Acquiescence is more easily inferred when the Executive may have in the past overreached, because that is the situation to which an objecting Congress is more likely to react, and in which inaction is more revealing. See, e.g., Haig v. Agee; Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).
 
 
 88
 Since I believe that a fair construction of the statute supports the reasonableness of the government's interpretation, and since I cannot see how the case could conceivably be resolved against the government if it failed to come forward with the "further examples" requested by the majority, maj. op. at 1056, I dissent from the decision to remand.
 
 III.
 
 89
 I have concerns as well with the majority's effort to distinguish subsections (27) and (28), and with its discussion of the McGovern Amendment. I agree that any interpretation of subsection (27) that renders subsection (28) superfluous and thereby nullifies the McGovern Amendment would be incorrect, and I agree as well that subsection (28) and therefore the McGovern Amendment are applicable when the mere fact of membership in an organization proscribed under subsection (28) is the only basis for exclusion. However, the majority has fashioned a rule that subsection (27) may be used only when the reason for exclusion is independent of the fact of membership. The McGovern Amendment does not require such a rule.
 
 
 90
 In order to appreciate the purpose behind the McGovern Amendment, it is necessary to understand the state of the law at the time of its enactment. Subsection (28) then rendered anyone who was, or had been, a member of any anarchist, totalitarian, or communist organization ineligible for a visa, with the exception of those whose membership had been involuntary, those who had joined at a very young age, those who had joined in order to obtain food rations or other essentials, and those who had terminated their membership and actively opposed the doctrines of the organization for at least five years prior to the date of their application. Applicants who fell within one of these exceptions were not per se eligible, but could be admitted only if the consular official and the Attorney General determined that their admission would be "in the public interest." 8 U.S.C. Sec. 1182(a)(28)(I) (1976). In addition to the blanket exclusion required by subsection (28), subsection (27) existed as it does today, and provided for additional exclusions.
 
 
 91
 An alien denied a non-immigrant visa under any but three of the thirty-three subsections of 8 U.S.C. Sec. 1182(a) (1976) could, notwithstanding his initial ineligibility, be admitted into the country "in the discretion of the Attorney General" if he approved a recommendation to that effect by the Secretary of State or a consular officer. 8 U.S.C. Sec. 1182(d)(3)(A) (1976). Subsection (28) was one of the thirty subsections to which this waiver provision was applicable, and it was this provision that the McGovern Amendment modified. The McGovern Amendment, as originally enacted, stated that "within 30 days of receiving an application for a non-immigrant visa by any alien who is excludable ... by reason of membership in or affiliation with a proscribed organization but who is otherwise admissible," the Secretary of State should recommend to the Attorney General that the application be granted, unless national security concerns are implicated.
 
 
 92
 The McGovern Amendment was an expression of congressional disapproval of the statutorily-required blanket exclusion of virtually all people who were or had been affiliated in some way with an organization of one of the named varieties. Prior to the enactment of the McGovern Amendment, the millions of people around the world who fell into one of the categories denominated by subsection (28) were automatically excluded, unless the Secretary of State and the Attorney General affirmatively decided otherwise. Individual decisions had to be made with respect to every applicant who would have been admitted into the country but for the fact that he belonged at some time to a named organization. The Senate Report accompanying the McGovern Amendment explained that it would have the effect of "open[ing] the way to visits by Eurocommunist leaders and to Communist labor leaders without the executive branch having to make the politically difficult individual decisions which might imply a change in overall U.S. policy toward Communism." S.Rep. No. 194, 95th Cong., 1st Sess. 13 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1625, 1635. Accord S.Rep. No. 842, 95th Cong., 2d Sess. 16-17 (1978) (describing visits by West European Communist leaders and Communist labor leaders as the "principal result" of the McGovern Amendment).
 
 
 93
 The McGovern Amendment applies only to applicants who are "otherwise admissible to the United States," and was amended in 1978 to include the following statement:
 
 
 94
 Nothing in this section may be construed as authorizing or requiring the admission to the United States of any alien who is excludable for reasons other than membership in or affiliation with a proscribed organization.
 
 
 95
 22 U.S.C. Sec. 2691(a) (1982). As the 1977 Conference Report explained, the McGovern Amendment applies only to those excludable "solely because of membership in or affiliation with a proscribed organization." H.R.Rep. No. 537, 95th Cong., 1st Sess. 31 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1625, 1661 (emphasis added). In order to elaborate upon the meaning of phrases like "solely because of membership" and "otherwise admissible," and to prevent "evasion" of the McGovern Amendment, the majority has formulated a rule that requires the government to process visa applicants under subsection (28), rather than (27), unless the reason for exclusion is not merely in addition to, but independent of, the fact of membership. As elaborated upon in the majority opinion, this requirement apparently was met when the Borge application was denied, but calls into question the denials in the other cases. Because I believe that the McGovern Amendment clearly does not apply to any of the visa requests before us today, I feel compelled to explain my understanding of what the McGovern Amendment does and does not do, and why a requirement that the reason be independent of membership will deny the Executive authority that Congress intended it to have.
 
 
 96
 Subsection (28) was enacted by a Congress that wished to exclude, as a general rule, all members of whatever level of participation in any communist, anarchist, or totalitarian organization. The presumption that all members of such groups, for that reason alone, ought to be excluded was rejected by the Congress that enacted the McGovern Amendment. But Thomas Borge, to take one of the cases before us, was not excluded because of membership in a communist party in Nicaragua. Borge is that country's Interior Minister and is one of the highest-ranking members of the Nicaraguan Cabinet. It was his governmental affiliation that triggered exclusion. Affidavit of Lawrence S. Eagleburger, J.A. at 141. Former Senator Pasti is an active participant in the World Peace Council, which the State Department believes to be an instrumentality of the Soviet government. Id. at 141-42. Olga Finlay and Leonor Rodriguez Lezcano are members of the Federation of Cuban Women which, according to the State Department, is controlled by the Cuban Communist Party. Their visa applications were submitted by the Cuban government, id. at 142, and Finlay has represented the Cuban government on a United Nations Commission. Declaration of Ogla Finlay, J.A. at 215.[4] According to the Eagleburger affidavit, "[t]he official, governmental nature of their proposed trip was clearly manifested both by the issuance to the two women of Cuban Diplomatic Passports and by the submission of their applications through diplomatic channels." Affidavit of Lawrence S. Eagleburger at 8, J.A. at 142. Unless governments can themselves qualify as "organizations" under subsection (28), affiliations with specific governments, even when through a subsection (28) organization, constitute grounds for exclusion separate from those found within subsection (28) itself. Relationships between our government and the governments of Nicaragua, the Soviet Union, and Cuba have been marked with tension. The difficulties that characterize these relationships are not simply a function of the sort of generalized suspicion of communism that animated the near-absolute ban of subsection (28). I do not know whether the complexities of these government-to-government relationships ought properly to be characterized as "independent of," or merely "additional to," the adherence of these governments to a communist ideology. I do know that nothing in the sparse legislative history surrounding passage of the McGovern Amendment warrants an extreme interpretation barring such factors from consideration. Such a reading is certainly not required in order to ensure that subsections (27) and (28) each retain an independent meaning. The best construction appears to be that subsection (28) applies when the sole ground for exclusion is membership in an organization of the sort described. When that membership raises additional concerns, as it does when it involves a connection to a government that implicates American foreign policy, subsection (27) comes into play.
 
 
 97
 The distinction is real and important between a generalized congressional distrust of communist ideology and organizations and a specific Executive concern over admitting a particular person associated with a foreign government that the Executive considers in some respects adversarial to ours. The McGovern Amendment applies only to the former. That is suggested by the only two concrete examples of its application given in the legislative history--Eurocommunist leaders and Communist labor leaders. In fact, the State Department authorization bill passed in 1979 amended the McGovern Amendment to make clear that it did not apply to "representatives of purported labor organizations in countries where such organizations are in fact instruments of a totalitarian state." 22 U.S.C. Sec. 2691(b) (1982). As Congressman Solarz explained to his colleagues on the House floor:
 
 
 98
 While [the McGovern Amendment] was very well intentioned, designed as it were to facilitate entry into the United States by a broad range of individuals, in practice it has resulted in a situation where a number of people have been admitted here who most of us, I think, do not believe should have been admitted to our country.
 
 
 99
 I have in mind, for example, ... the so-called leaders of purported labor unions in the Soviet Union and in other Communist countries of Eastern Europe who, whatever else they may be, cannot be considered genuine representatives of workers but are, rather, representatives of the State.
 
 
 100
 125 Cong.Rec. 8345 (1979). While the specific provision added dealt only with labor leaders, the understanding it reflected--that the status of applications by representatives of foreign governments were not to be affected by the McGovern Amendment, whatever the applicants' additional organizational affiliations might be--has broader application.
 
 
 101
 The majority in fact concedes that governmental affiliations qualify as legitimate grounds for the denial of a visa under subsection (27), and it is these affiliations that the defendants have consistently cited as the basis for denial in these cases. See Statement of Material Facts as to Which There is No Genuine Dispute at 5, 7, 9, J.A. at 128, 130, 132; Affidavit of Lawrence S. Eagleburger at 3, 7, 8, 9, J.A. at 137, 141, 142, 143.[5] The majority's quarrel with the defendants' position, therefore, is that the State Department has not advanced this rationale of government ties independently of organizational ties, but instead, in some of these cases, has found the nexus between the applicant and the government wholly within the applicant's membership in subsection (28) organizations. Thus, even if officials of a foreign government acting in that capacity create an organization of the sort described in subsection (28), fund it with government revenues, choose its staff, and decide upon its activities and policies, members of that organization are nevertheless not sufficiently affiliated with the parent government to justify their exclusion under subsection (27). It would seem entirely rational for the State Department to conclude that a member of the Communist Party of the Soviet Union was affiliated with the government of that nation but that a member of the Communist Party of the United Kingdom was not affiliated with the government of his country. In the former case, party membership carries an additional, though not an independent, status. The requirement of an additional status--governmental affiliation--is quite enough to give meaning to the McGovern Amendment and to distinguish subsection (27) from subsection (28).
 
 
 102
 The majority's elevation of form over substance has no basis in the language or the legislative history of the McGovern Amendment, which are silent on the question of where subsection (28) leaves off and subsection (27) begins. The majority infers its rule of independence from a structural analysis; it seeks to ensure that (28) is not completely subsumed within (27). But unless the majority believes that every subsection (28) organization is an instrumentality of a foreign government whose representatives the United States will wish to exclude, subsection (28) remains intact and independent without the majority's rule. Without the McGovern Amendment, there would be a statutory policy to exclude all members of subsection (28) organizations; that policy has not been revived as the rationale of the decision we review. The McGovern Amendment is, therefore, in no danger of becoming a nullity.
 
 
 103
 The majority holds that regardless of any connection that might exist between a particular proscribed organization and a particular foreign government, the McGovern Amendment prohibits using the associational ties as a basis for exclusion. The McGovern Amendment therefore becomes peculiarly selective in its prohibition of guilt by association. If the World Peace Council were not a subsection (28) organization, and came to be viewed as an instrumentality of, for example, the Libyan government instead of the Soviet government, the McGovern Amendment would not apply and members of the Council could be excluded. While Congress' attitude toward the exclusion of Communists may have changed somewhat between 1952 and 1977, it is doubtful that the McGovern Amendment was meant to confer upon communists a favored entry status. But that is precisely what the majority opinion does. I believe the more logical reading of the McGovern Amendment is the more narrow one--that the McGovern Amendment sought to end the statutory policy of excluding all members of subsection (28) organizations automatically, when there was nothing more than the fact of membership as a basis. I do not believe the provision was meant to insulate members of those organizations--and only members of those organizations--from whatever additional grounds for exclusion their membership raised.
 
 
 104
 The majority's rule of independence is thus neither supported by the language or the legislative history of the McGovern Amendment nor reasonably inferable from the structure of the statutory scheme, and its application will lead to illogical and inconsistent results. This rule was apparently fashioned in part as a means of preventing the Executive from "evading" the limitations of the McGovern Amendment. I wish to note why, even were the majority's construction to be otherwise correct, the safeguard created may be toothless. First, it is at least an open question whether the terms of the McGovern Amendment are in fact mandatory. The State Department has apparently interpreted them to be, see Drischler letter (cited in maj. op. at 23), and there is legislative history to support this interpretation. See S.Rep. No. 842, 95th Cong., 2d Sess. 16 (1978) (one year after passage, describing McGovern Amendment as "mandating" favorable recommendation from Secretary of State). The provision itself, however, only declares that the Secretary "should" make a favorable recommendation, 22 U.S.C. Sec. 2691(a) (1982). In 1978, the Senate voted in favor of amending the provision to substitute the word "shall" for "should," but that revision was dropped at conference and the original language was retained. H.R.Rep. No. 1535, 95th Cong., 2d Sess. 44 (1978), U.S.Code Cong. & Admin.News 1978, pp. 2424, 2485. In 1979, during a discussion on the House floor over proposed modifications of the McGovern Amendment, Congressman Solarz stated:
 
 
 105
 Right now, under the McGovern amendment, the Secretary of State is obligated to recommend the waiver that they be admitted, unless he believes that admitting them would constitute a threat to the national security of the United States; and if he feels that they will not constitute a threat to the national security of the United States, he is obligated to recommend the waiver.
 
 
 106
 125 Cong.Rec. 8347 (1979). Congressman Fascell, Chairman of the Subcommittee on International Operations, responded:
 
 
 107
 I just want to say that I agree with the explanation made by the gentleman from New York (Mr. Solarz), with one correction: The present language of the law, that is, the McGovern amendment, is not mandatory.
 
 
 108
 Other than that, Mr. Chairman, I would agree with everything which the gentleman from New York has said.
 
 
 109
 Id. A bit later, Congressman Solarz indicated his agreement:
 
 
 110
 If the gentleman will yield, I want to underline what the subcommittee chairman said, that the McGovern language is not mandatory. The Conferees went to a good deal of trouble to use the word "would," [sic] not "shall,"....
 
 
 111
 Id.
 
 
 112
 Second, even if the McGovern Amendment is mandatory, it requires only that the Secretary of State issue a favorable recommendation. Before the prohibition embodied in subsection (28) may be waived, that recommendation must be approved by the Attorney General, who has complete discretion not to do so. 8 U.S.C. Sec. 1182(d)(3) (1982). The Conference Report accompanying the McGovern Amendment expressly noted that "[t]his provision does not affect the authority of the Attorney General to deny waiver requests." H.R.Rep. No. 537, supra, at 32, U.S.Code Cong. & Admin.News 1977, p. 1662; accord S.Rep. No. 842, supra, at 17. The Attorney General is therefore not required to grant visas under subsection (28) to those applications which the Secretary of State is arguably required to support.
 
 
 113
 This fact has unfortunate consequences for the majority's reasoning. There are only two possibilities: that the Secretary of State and the Attorney General will behave disingenuously in order to evade the McGovern Amendment or that they will not.
 
 
 114
 As the majority indicates, maj. op. at 1059 n. 22, while the Attorney General retains the authority to decline to grant waivers for foreign policy reasons, it is unlikely that he would in fact make such determinations without guidance from the Secretary of State. Practically speaking, however, there is no way to prevent the Secretary of State from issuing a formal recommendation favoring admission, pursuant to his statutory duties as defined by this court, while also letting the Attorney General know that the granting of a waiver would prejudice the conduct of foreign affairs. Such behavior would render today's holding meaningless, but I can think of no way in which it could be policed. The majority suggests that its rule of independence is needed to ensure a mechanism for judicial review of a potentially disingenuous State Department. Maj. op. at 1058 n. 20. But since the Attorney General remains free to decline to grant the visa notwithstanding a favorable recommendation, and the Secretary of State is effectively able to urge him to do so, then, on the hypothesis of disingenuity, the majority's rule accomplishes nothing and is, therefore, unnecessary. The denial of a waiver remains "walled off from any effective challenge." Id.
 
 
 115
 I agree with the majority, however, that compliance with the McGovern Amendment, as now interpreted, is to be expected. We may anticipate that the State Department will adhere to the standard articulated today in all respects, and will not take back in private the formal recommendations sent to the Attorney General, despite the fact that it possesses the power to do so. This is apparently the majority's expectation--in which case I am not at all certain why the mere fact that the State Department "possess[es] [the] power" to subvert the McGovern Amendment in other ways leads the majority to feel a prophylactic rule of sorts is necessary. Maj. op. at 1058 n. 20. It is puzzling that the majority posits both integrity and lack of integrity in the same Department in order to support different stages of its argument.
 
 
 116
 More importantly, if compliance with the spirit of its opinion is indeed the result the majority expects, it cannot claim that it has "preserve[d] the President's potency in this area." Maj. op. at 1049 n. 2. The majority supports that assertion by reference to the President's power, undisturbed by its opinion, to exclude aliens through the issuance of a Presidential Proclamation. However, if today's holding ultimately means that certain aliens may not be excluded save through such a proclamation, then the ability of the Executive to use the denial of visas for foreign policy purposes will be significantly diminished. In many instances, the use of a Presidential Proclamation would be diplomatic overkill and would lend an international importance to the person excluded that use of subsection (27) avoids. If such results are deemed unacceptable, many persons the Executive would like to exclude for good reasons will be allowed to enter, and he will be deprived of much of the flexibility and nuance that are essential in the conduct of foreign relations.
 
 IV.
 
 117
 I am therefore left with plaintiffs' constitutional challenges. The statutory issues are somewhat complex; the constitutional issues are not. The Supreme Court precedent is clear and consistent.
 
 
 118
 Plaintiffs do not assert that the four unsuccessful visa applicants have any constitutional right to enter the United States. Instead, they assert their own rights, as listeners, to receive information. Such interests have been held to "implicate[ ]" first amendment rights and thus to confer standing in cases such as these. Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). It is clear, however, that a potential listener who seeks a judicial declaration that the government's decision to exclude an alien is unconstitutional bears a difficult burden. That must be so if the right to listen, which Kleindienst recognizes, is not to destroy the United States' sovereign power to control entry into its territory. The first amendment, it must be remembered, does not protect only speech uttered in a lecture hall or an auditorium, and the interest in receiving information can be asserted by any individual in this country who wishes to speak with an alien. See id. at 768, 92 S.Ct. at 2584. Because the exclusion of aliens remains "a fundamental act of sovereignty," Knauff v. Shaughnessy, 338 U.S. at 542, 70 S.Ct. at 312, the Supreme Court has held
 
 
 119
 that when the Executive exercises this power ... on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.
 
 
 120
 Kleindienst v. Mandel, 408 U.S. at 770, 92 S.Ct. at 2585.
 
 
 121
 In support of their first amendment argument, plaintiffs cite approximately twenty Supreme Court decisions, only one of which, however, deals with constitutional review of immigration law. There is in fact an unbroken line of decisions limiting the scope of judicial review in this area, of which Kleindienst is only one of the more recent. The Supreme Court has repeatedly held that the power to exclude aliens is "a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." Shaughnessy v. Mezei, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953). Accord Regan v. Wald, 468 U.S. 222, 104 S.Ct. 3026, 3039, 82 L.Ed.2d 171 (1984); Fiallo v. Bell, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977); Harisiades v. Shaughnessy, 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952); see also Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954) ("that the formulation of [immigration] policies is entrusted to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government").
 
 
 122
 Plaintiffs' primary legal claim is that the first amendment forbids the Executive from making decisions to exclude based on the content of an applicant's political beliefs. Such an assertion is wrong as a matter of law, and irrelevant to the case at bar. It is wrong as a matter of law because it describes the lower court holding reversed by the Supreme Court in Kleindienst v. Mandel. Mandel v. Mitchell, 325 F.Supp. 620 (E.D.N.Y.1971) (three-judge court). In upholding the refusal of the Attorney General to grant a waiver to Mandel from the mandatory exclusion of subsection (28), the Kleindienst Court necessarily upheld the constitutionality of the exclusion of communists required by subsection (28)--indisputably an exclusion based upon Mandel's political beliefs.
 
 
 123
 In any event, plaintiffs' characterization of the government's conduct in these cases is simply inaccurate. The government does not here enforce a policy of making decisions to exclude based on the content of applicants' political beliefs, but has instead chosen to exclude applicants who are members of or connected with particular foreign governments. By wrongly equating the two policies, plaintiffs mischaracterize the United States' action as "content-based censorship." Brief for Appellants at 56. Even if that were correct, as I have already shown, plaintiffs would not automatically prevail in the legal context of visa denials. It is idle to pretend that the United States is attempting to prevent certain ideas from reaching the American people. Those ideas are part of our domestic and international political discourse and their expression in this country is fully protected by the first amendment. Kleindienst demonstrates that the additional right to have particular aliens come here to express those ideas is limited by our government's plenary power over the admission of aliens. But, in any case, plaintiffs' description of what is taking place here is wrong. The existence of ideological differences between the United States and a foreign government does not mean that a denial of visas to persons affiliated with that government is an exclusion resting solely on the content of the applicants' political beliefs. Classifications of the sort involved here have been upheld in the past against first amendment challenges. Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), upheld restrictions on travel by American citizens to Cuba. Preventing Americans from travelling to a foreign country is certainly not less serious constitutionally than preventing that country's citizens from coming here. The government's actions at issue in these cases obviously withstand the limited judicial scrutiny defined by the Kleindienst standard.
 
 
 124
 Plaintiffs briefly offer one other constitutional argument--that the broad discretion delegated to the Executive in subsection (27) violates principles of separation of powers. Plaintiffs have chosen an especially inhospitable legal environment in which to attempt the resuscitation of the non-delegation doctrine, for it is in the context of foreign affairs that the Supreme Court has repeatedly upheld the legitimacy of broad and discretionary Executive power. "[B]ecause of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature," statutes conferring authority upon the President to conduct foreign affairs have necessarily been less detailed and specific than statutes concerned with domestic affairs. Zemel v. Rusk, 381 U.S. at 17, 85 S.Ct. at 1281. See supra Part II, and cases cited there. This constitutional argument is therefore no more substantial than plaintiffs' first amendment claim.
 
 V.
 
 125
 In an affidavit filed below, Under Secretary Eagleburger stated:
 
 
 126
 The overwhelming majority of NIV applications involve only ordinary circumstances of aliens seeking to visit the United States for reasons of business or pleasure. However, in some instances, the issuance, denial or revocation of a NIV to a particular alien can have significant diplomatic or foreign policy ramifications to the extent that the issuance or denial is construed as an act of the United States Government. Thus, for example, the issuance or denial of a visa to a foreign government official may be taken by the alien's government as a reflection of United States foreign policy vis-a-vis that government and may result in reciprocal action or retaliation by that government. Similarly, the denial of visas to foreign government officials is one of the tools available to a government to communicate its attitude about the policies of other states.
 
 
 127
 J.A. at 137. This description of State Department policy is compatible with the statutes governing the issuance of non-immigrant visas, statutes which are constitutional under all applicable Supreme Court precedent. In the area of immigration law, "interwoven" as it is with "the conduct of foreign relations," Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 518-19, 96 L.Ed. 586 (1952), Congress has traditionally delegated--and the courts have respected--broad and discretionary Executive authority.
 
 
 128
 The majority's opinion is a cautious one: major issues presented in this litigation are left for subsequent resolution. Yet that virtue seems to me inadequate. The majority's constricted method of statutory construction, which is inconsistent with Chevron, its insufficient appreciation of the weight to be accorded the context of foreign policy in which this case arises, and its lack of deference to the determinations of the Department of State combine to produce an unnecessary remand. They seem likely ultimately to produce an incorrect and unfortunate result in this litigation. By itself that may not be very serious, although we have no way of knowing, but today's approach is capable of creating a series of similarly unfortunate results in other cases implicating foreign policy. If the approach employed here is repeated, then the majority opinion begins, albeit cautiously, a process of judicial incursion into the United States' conduct of its foreign affairs. For that reason, and because I believe that the law and the public record before us require affirmance of the district court's grant of summary judgment, I respectfully dissent.
 
 
 
 [1]
 Routine name checks are ordinarily made in these cases through United States intelligence agencies. The State Department has acknowledged that "no recommendations were received from the Department of Justice or any of its components" regarding the visa requests involved in this litigation. Affidavit of Lawrence S. Eagleburger, reprinted in Joint Appendix at 140-41 (affidavit also acknowledges that information supporting visa denials for foreign policy reasons often includes "data and analyses from the United States law enforcement and intelligence communities")
 
 
 [2]
 On October 4, 1985, acting pursuant to Sec. 212(f) of the Immigration Act, 8 U.S.C. Sec. 1182(f) (1982), President Reagan issued a proclamation suspending the entry into the United States of officers or employees of the Cuban government or the Cuban Communist Party. See Proclamation No. 5377, 50 Fed.Reg. 41329 (1985). If this Proclamation covers Finlay and Lezcano, the President's directive might constitute an independent intervening cause for future exclusions, and thus render the City of New York case moot. See Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). The current record, however, is inadequate to enable us to determine, dispositively, whether the October 4, 1985, Proclamation would bar the entry of these women. Compare Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 164-65 (stating that Finlay is an official of the Cuban Communist Party and a member of the National Committee of the Federation of Cuban Women and Lezcano, an official of the Federation of Cuban Women), with Affidavit of Olga Finlay, reprinted in Joint Appendix at 216 (stating that the affiant is not a member of the Cuban Communist Party and that the Federation of Cuban Women is not an instrumentality of the Cuban government or the Communist Party) and Affidavit of Leonor Rodriguez Lezcano, reprinted in Joint Appendix at 245 (same). We decline to decide this mootness issue on the scant record before us. The same issues are raised by all three consolidated cases; a finding that City of New York has become moot would not relieve this court of the responsibility to decide those common issues. We therefore leave the question of the impact of the President's Proclamation to the district court on remand
 We note, however, that the issuance of this Proclamation provides support for one of the plaintiffs' arguments: even if the court were to find that subsection (27) cannot be applied to bar aliens whose mere entry would threaten United States foreign policy interests, the Executive would not be helpless in the face of such a threat. He may act pursuant to section 1182(f) to suspend or restrict "the entry of any aliens or any class of aliens" whose presence here he finds "would be detrimental to the best interests of the United States." The President's sweeping proclamation power thus provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the categories in section 1182(a). See Brief of Plaintiffs-Appellants at 40-42. Thus, we need not reject, avoid, or augment the formulation Congress adopted in subsection (27) in order to preserve the President's potency in this area. Cf. Dissent at 1063-64.
 
 
 [3]
 The Immigration Act and related regulations provide explicitly for the participation of United States family members or employers in visa applications by certain aliens to whom they are connected. See 8 U.S.C. Secs. 1151-1154 (1982) (immediate relative petitions); 8 C.F.R. Sec. 204 (1985) (same); 8 C.F.R. Sec. 212.8 (1985) (employer petitions). The plaintiffs in this case, however, are neither family members nor employers of the aliens in question. Therefore, they have no right to participate in the administrative process, and no attendant claims for relief, by virtue of these provisions. Nor does any other provision of the Immigration Act explicitly or implicitly authorize the claims in suit. See Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975)
 
 
 [4]
 Section 702 affords a right of review to "[a] person suffering a legal wrong because of agency action, or [who is] adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. Sec. 702 (1972)
 
 
 [5]
 The McGovern Amendment, see supra at 1048, adds force to the position that plaintiffs suffered an injury that arguably falls within the zone of interests of the relevant law. See infra at 1057-58
 
 
 [6]
 The government cites Block v. Community Nutrition Institute, 467 U.S. 340, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270 (1984), as support for the proposition that a history of judicial construction barring review and congressional acquiescence in that construction may override the general presumption favoring review. That proposition, while true, is irrelevant to this case. Unlike the statute in Block, the statute in this case explicitly provides for judicial review. See Block, 104 S.Ct. at 2457. To override the language of a statute, indirect evidence of congressional intent, such as acquiescence in judicial construction, must be strong. Cf. Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("Absent a clearly expressed legislative intent to the contrary, [statutory] language must ordinarily be regarded as conclusive."). Moreover, the Block rule is inapplicable to this case because there exists no longstanding judicial practice of refusing to review claims like those raised here. Cf. Block, 104 S.Ct. at 2454-56 (holding that statute precludes judicial review of consumers' claims although it allows review of milk handlers' claims). This case involves claims by United States citizens rather than by aliens, unlike Karmali v. Immigration and Naturalization Service, 707 F.2d 408 (9th Cir.1983); claims concerning the decisions of State Department officials rather than consular officers abroad, unlike Castaneda-Gonzalez v. Immigration and Naturalization Service, 564 F.2d 417, 428 n. 25 (D.C.Cir.1977); and statutory claims that are accompanied by constitutional ones. The defendants have not produced a single case, and the court is aware of none, in which this kind of claim was found to be outside the province of the federal courts. On the contrary, in a case specifically addressing this type of claim, the Third Circuit found that the APA applied and the court reviewed the merits of the claim. See Acosta v. Gaffney, 558 F.2d 1153, 1156 (3d Cir.1977)
 
 
 [7]
 This characterization of the government's reasons may be gleaned from publicly available documents. See Affidavit of Lawrence S. Eagleburger, reprinted in Joint Appendix at 141-43 (noting the membership or affiliation of each excluded alien); Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 162-65 (same); see also Abourezk, 592 F.Supp. at 888 (giving a general description of the reasons stated in the classified affidavits). This court has also examined the reasons offered in the in camera affidavits; they do not decrease our concern over the inaccuracy of the State Department's public representations that these visa denials do not in any way forecast the results of a future application
 
 
 [8]
 In addition, the plaintiffs assert that they are suffering a present and continuing harm in the form of the "chill" that the challenged State Department policy places on their first amendment interest in hearing foreign speakers. United States audiences are reluctant to extend invitations to foreign speakers, plaintiffs urge, for fear that the aliens may be subjected to the embarrassment of being denied a visa on the ground that they pose a danger to the public welfare. Similarly, the alien invitees may be unwilling to accept invitations when the price is to submit to such "ideological scrutiny." See Brief of Amici Curiae American Association of University Professors et al. at 12-13 (presenting examples of chilling effect). In the first amendment area, such "chill" has long been recognized by the courts as a harm independent from the actual application of the challenged statute. See Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940) ("It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion.")
 
 
 [9]
 The Senate Reports both state that
 [u]nder existing law, among the excludable aliens are certain aliens who seek to enter the United States whose entry would be prejudicial to the public interest or would endanger the safety of the United States. The committee has broadened this class of excludable aliens to include those aliens who seek to enter the United States to engage in activities which would endanger the welfare of the United States.
 S.REP. NO. 2230, 81st Cong., 2d Sess. 5 (1950); S.REP. NO. 2369, 81st Cong., 2d Sess. 10 (1950).
 
 
 [10]
 The Conference Committee Report states that the relevant section
 provides for the exclusion from the United States of aliens seeking to enter for the purpose of engaging in activities which are prejudicial to the public interest and dangerous to the welfare or safety of the United States, whether or not such aliens seek to enter the United States solely, principally, or incidentally for such purpose. Existing law merely provides for the exclusion of aliens if the Attorney General knows or has reason to believe that such aliens are seeking to enter the United States to engage in activities which would endanger the public safety of the United States.
 H.R.REP. NO. 3112, 81st Cong., 2d Sess. 54 (1950), U.S.Code Cong.Serv. 1950, pp. 3886, 3906.
 
 
 [11]
 The Dissent finds strongest support for the State Department's reading in the legislative history of a bill enacted in 1941 containing a prescription from which subsection (27) was later derived. Dissent at 1065-66. We do not find the history of the earlier formulation as clear as the Dissent contends it is. On the contrary, one searches all the legislative history in vain for an illustration homing in on the question at issue
 Thus, one can only speculate on what the legislative report participants had in mind when they made their seemingly interchangeable references to "entry" and "activities." Conceivably, as the Dissent presumes, they believed "activity" embraced the "act" of entry. Or, they may have understood "entry" to implicate activities likely to be pursued upon admission. At least as plausibly, their word choices were casual and inadvertent, not motivated or informed by the precise consideration at issue in the instant cases.
 In sum, we think it plainly wrong as a general matter, and in this case in particular, to regard committee reports as drafted more meticulously and as reflecting the congressional will more accurately than the statutory text itself. Committee reports, we remind, do not embody the law. Congress, as Judge Scalia recently noted, votes on the statutory words, not on different expressions packaged in committee reports. Hirschey v. FERC, 777 F.2d 1, 7-8 & n. 1 (D.C.Cir.1985) (Scalia, J., concurring).
 
 
 [12]
 There is no possibility of congressional acquiescence in a longstanding judicial construction. The parties have uncovered only two court cases, in addition to this one, concerning the scope of subsection (27). In El-Werfalli v. Smith, 547 F.Supp. 152 (S.D.N.Y.1982), the court held that a Libyan student seeking to enter the United States in order to study airplane maintenance was properly excluded under subsection (27). While such study does not rise to the level of subversive activity, it clearly constitutes an "activity" exceeding mere presence. In Allende v. Shultz, 605 F.Supp. 1220 (D.Mass.1985), the court did not reach this precise issue because it held the government's reasons for exclusion inadequate on other grounds. See infra note 16. Thus, judicial opinions provide no grounding for the State Department's interpretation
 
 
 [13]
 In 1959, 1961, and 1962, the State Department refused a visa to Thomas W.I. Liao, the self-appointed leader of a movement to establish an independent Formosa. The Department found that there was "a clear incompatibility between Mr. Liao's projected activities while in the United States and our foreign policy objectives with respect to Taiwan and the Republic of China." Second Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 306. In July of 1964, the Department also denied a visa to Mme. Ngo Dinh Nhu, the sister-in-law of the late Prime Minister of Vietnam, on the ground that "her expected activities would only serve as a demoralizing influence on the people and Government of Vietnam," which the United States was committed to supporting. Id. at 308
 
 
 [14]
 The Dissent suggests, and we acknowledge, that such information may be difficult to find or inconclusive. See Dissent at 1067-68. Given this record, however, one can only offer guesses, bets, or suspicions about the existence or weight of such evidence. We do not think it proper to prejudge this issue on a barren record and thereby short-circuit the inquiry into congressional intent. The district court, upon fuller consideration, may find the evidence of congressional acquiescence insufficient in quantity or quality, but that judgment, we think, should be made after an examination of the available evidence, not before
 
 
 [15]
 We note in this regard that the government has named a few persons to whom visas were denied, allegedly under the authority of subsection (27), and has not suggested that any privilege would shield a further listing of cases in point
 
 
 [16]
 The district court in Allende v. Shultz, 605 F.Supp. 1220 (D.Mass.1985), adopted this view. Finding it "unnecessary ... to scrutinize the parameters of subsection (27)," the court recognized that traditional principles of statutory construction required that "[a]mong the classes of aliens to which subsection (27) does not apply are those which fall squarely within the ambit of one of the other thirty-two statutory categories...." Id. at 1224. "Because subsection (28) directly encompasses Mrs. Allende's membership in [two communist organizations]," the court held that "her affiliation with these organizations is not, in itself, a 'facially legitimate and bona fide' reason for her exclusion within the meaning of subsection (27)." Id. at 1225 (quoting Kleindienst v. Mandel, 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972))
 
 
 [17]
 Final Act of the Conference on Security and Co-Operation in Europe, Aug. 1, 1975, Dep't of State Pub. No. 8826 (Gen.For.Pol.Ser. 298), reprinted in 14 I.L.M. 1292 (1975)
 
 
 [18]
 Nothing in our analysis inhibits the State Department from using a group affiliation to deny visas to members of terrorist groups, see MANUAL, supra at 20, or organized crime syndicates, see id. The McGovern Amendment applies only to the organizations specifically proscribed by the Act and, of the thirty-three categories of excludable aliens, only subsection (28) specifically addresses membership in or affiliation with an organization as the basis for exclusion. The organizations proscribed in (28) are Communist and anarchist groups. See 8 U.S.C. Sec. 1182(a)(28) (1982)
 
 
 [19]
 The government has offered no evidence of congressional acquiescence in an administrative practice that would alter our view that the legislature did not cast subsections (27) and (28) as interchangeable parts. Indeed, when asked at oral argument, government counsel was unable to identify any case other than this one and Allende, 605 F.Supp. 1220 (D.Mass.1985), in which subsection (27) was used to deny a visa to an alien to whom subsection (28) applied. See Transcript of Proceedings at 41-42, Abourezk v. Reagan, No. 84-5673 (D.C.Cir. Sept. 23, 1985)
 
 
 [20]
 The Dissent argues that the McGovern Amendment retains its vitality even without the interpretation we embrace today. Without the McGovern Amendment, subsection (28) would pose a presumptive bar to the entry of any member of a Communist organization. The Dissent points out that the State Department has not explicitly revived that policy of general exclusion, it has simply determined to exclude members of those subsection (28) organizations it believes to be affiliated with certain foreign governments. See Dissent at 1072. The Dissent makes the practical prediction that not all subsection (28) organizations will be so affiliated, and therefore finds that the McGovern Amendment is left intact
 The Dissent's analysis, we believe, is flawed in this respect: the issue turns not on practical predictions but on the possession of power. If the State Department's current policy entails the power to achieve precisely the same results as under subsection (28) before the McGovern Amendment, then it is small virtue that those results now can be achieved without explicitly reviving a policy of ideological exclusion. Under the Dissent's interpretation of the statute, the State Department may exclude someone simply by pointing to her membership in a subsection (28) organization; the additional, conclusory assertion that the organization has certain affiliations provides no safeguard because the assertion may be offered in every case and cannot be questioned or reviewed by any court. See Dissent at 1070 n. 4. A statement thus walled off from any effective challenge scarcely qualifies as a reason.
 The State Department therefore remains armed with the power to exclude all members of subsection (28) organizations for foreign policy reasons. That is precisely the power the McGovern Amendment was designed to revoke. We conclude that the State Department's approach does not leave the McGovern Amendment intact and that the more stringent standard we adopt is necessary to effectuate congressional intent.
 This standard will also leave intact the independent scope of subsection (27). For example, all four of the illustrative applications of (27) in the State Department's MANUAL, see supra at 1055, would still be appropriate under our view of the respective provinces of the two clauses.
 
 
 [21]
 The Dissent suggests that this interpretation creates a "favored entry status" for communists: members of organizations not included in subsection (28) can be excluded on foreign policy grounds under subsection (27) simply because their membership links them to a hostile foreign government, but members of subsection (28) groups cannot. See Dissent at 1072. The McGovern Amendment was, however, a response to the historically disfavored position of subsection (28) organizations. The imaginary Council in the Dissent's hypothetical never suffered from the explicit ideological exclusion embodied in subsection (28) or the extreme and general public hostility that motivated Congress to include that subsection in the Act in 1952. See generally THE MEANING OF MCCARTHYISM (E. Latham ed. 1965) (a collection of essays on the causes and effects of McCarthyism)
 Congress could reasonably have believed that these special disabilities warranted special precautions where subsection (28) organizations were concerned. If a member of a subsection (28) group poses a threat to national security, she stands on the same footing as a similarly threatening member of any other type of group. But where no such threat is present, Congress determined that a close look is in order, in fidelity with the Helsinki Accords, see supra at note 17, before the United States excludes members of subsection (28) organizations. This closer look insures that the longstanding practice of excluding such persons under subsection (28)--which codified an historically demonstrated animosity--does not taint exclusions after the McGovern Amendment's repudiation of that animosity.
 
 
 [22]
 The Dissent describes our "independent reason" safeguard as ineffective, entirely vulnerable to the power the Attorney General holds: he may deny a visa under subsection (28) despite the Secretary's recommendation of entry. See Dissent at 1073-74. Foreign policy, however, is the Secretary's specialty; it is not the Attorney General's customary field. Our decision, it is true, in no way prevents the Attorney General from venturing into the foreign policy domain. But we expect, as we assume Congress did when it adopted the McGovern Amendment, that instances in which the Attorney General rejects action in the foreign policy realm that the Secretary recommends will be extraordinary. In sum, Congress apparently designed the Amendment with the traditional division of responsibility between the two executive departments in full view. Such divisions of responsibility, and the closely kept balance of powers that results from them, have long been regarded as an effective check on the disingenuity of individual public officials. See The Federalist No. 51, at 344-45 (J. Madison) (P. Ford ed. 1898). So long as the traditional allocation of responsibility between the two departments is maintained, Congress' action and our endeavor to assure its vitality should not be exercises in futility
 
 
 [23]
 Perhaps the State Department has shied away from this rationale in part because it is problematic whether all of these aliens have independent affiliations with hostile governments. Tomas Borge clearly has such a connection: he holds a cabinet post in the Nicaraguan government. But some of the other speakers in this case lack such an unambiguous connection to a hostile foreign government. For example, if Nino Pasti has any governmental affiliation, it is to the Italian government, in which he served as both a Senator and a General in the armed forces. See Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 163. Of course, no one--neither the State Department nor the Dissent--argues that Pasti was, or should be, excluded because of a connection to the government of Italy. Instead, the suggestion is that Pasti's affiliation with the Soviet government warrants his exclusion. This alleged affiliation consists, however, solely and simply in Pasti's participation in the World Peace Council, an organization clearly covered by subsection (28) and the McGovern Amendment. See Affidavit of Louis P. Goelz, reprinted in Joint Appendix at 163. Similarly, Leonor Rodriguez Lezcano, so far as the current record indicates, has never held public office in Cuba or actively represented the government of that country. Her affiliation with the Cuban government apparently arises, according to the State Department, because of her participation in the Federation of Cuban Women, a subsection (28) organization. See id. at 164-65. Thus, we do not now comprehend any basis for claiming that these two visa applicants have governmental affiliations independent of their membership in subsection (28) organizations
 
 
 [24]
 Because we find that questions remain concerning the State Department's compliance with the statutory requirements, we do not reach the plaintiffs' constitutional claims. We therefore express no opinion about the section of the district court opinion devoted to the analysis of those claims
 
 
 [1]
 Defendants have raised before us, as they did below, the question of whether plaintiffs have standing to mount a statutory challenge to these exclusions. They concede that the Supreme Court has already implicitly decided the issue of whether plaintiffs who wish to meet with excluded aliens have standing to raise a constitutional (first amendment) claim. Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 688 (1972). They argue, however, that the associational rights sufficient to confer first amendment standing in this case provide no standing to contend that the government lacks statutory authority for the exclusions
 The two sets of claims, however, cannot so easily be broken apart. A court faced with this constitutional challenge must first construe the statutes to determine whether they authorize what was done and, if so, whether they pass constitutional muster. It would be extraordinary if the court found that the statutes did not authorize the exclusions, thus the first amendment did not invalidate the statutes, but, since the challenge and standing were based on the first amendment, the court was without power to rule the unauthorized exclusions illegal. This would be witty, no doubt, but it smacks too much of the hairsplitting that brought the old rules of common law pleading into disrepute.
 When the actions of the executive branch are challenged as violative of constitutional rights, the issue of the scope and source of executive authority necessarily becomes part of the analysis in which a court is required to engage. For example, in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), the Supreme Court invalidated President Truman's seizure of a steel mill because it was authorized neither by an explicit grant of power from Congress nor by any inherent Executive power. Had President Truman relied not on his inherent authority but rather upon a statute which did not in fact confer upon him the necessary power, his act would have been invalidated nonetheless. That is the situation the majority thinks may exist here. Whether the majority is right or wrong on the statutory issue, there can be no question that appellants have standing to raise it.
 
 
 [2]
 As the majority notes, there is already some evidence in the record of prior administrative interpretation supporting the government's position. The State Department Manual lists four "type cases [that] are illustrative, but ... by no means exclusive, of those involving a determination of the applicability" of subsection (27). One of the four type cases consists of
 [a]liens who are notorious for allegedly engaging in excesses, including physical brutality while in political power in their native land, or who were prominently identified with any former regime which did so.
 Foreign Affairs Manual, pt. II, Sec. 41.91(a)(27), reprinted in 6 C. Gordon & H. Rosenfeld, Immigration Law and Procedure 32-214.18 (1985). The concern reflected here has nothing to do with the specific activities in which these aliens are expected to engage while in the United States, but is rather an expression of disapproval of brutal governments; hence the exclusion of those "identified" with such regimes.
 The majority also discusses three specific past exclusions under subsection (27) cited by the government and concludes that only one of the three was in fact an exclusion on the basis of prejudicial entry. Maj. op. at 1056 & n. 13. I think it only fair to note, however, that the government did not cite these examples for the purpose of supporting its argument that prejudicial entry alone is sufficient to merit exclusion. They were invoked instead to support the wholly separate point, accepted by the majority, that damage to foreign policy interests has been considered "prejudicial to the public interest." See Brief for Appellees at 54.
 Finally, the majority makes reference to the conflicting affidavits submitted by the parties. Maj. op. at 1055. The affidavits of Lawrence S. Eagleburger, at the time the Under Secretary of State for Political Affairs, and Lewis Goelz, Deputy Assistant Secretary of State for Visa Services, support the government's position. J.A. at 138, 159-60. Plaintiffs have submitted the affidavit of Leonard Meeker, former Legal Adviser to the Department of State, which contradicts the position taken in the government's affidavits. J.A. at 250-52. Mr. Meeker's affidavit, however, offers an interpretation of subsection (27) that the majority has in part explicitly rejected--specifically, that subsection (27) only authorizes denial of visas to "aliens whose anticipated activities in the United States would create dangers to this country of a gravity comparable to espionage and sabotage," such as "murder, mob violence or terrorism." J.A. at 251-52; contra maj. op. at 1053-54. Such an interpretation is belied by the three specific examples of past exclusions described in the majority opinion, and would render subsection (27) entirely duplicative of subsection (29), which requires the exclusion of all aliens "with respect to whom the consular officer or the Attorney General knows or has reasonable ground to believe probably would, after entry, (A) engage in activities which would be prohibited by the laws of the United States relating to espionage, sabotage, public disorder, or in other activity subversive to the national security...." An interpretation of subsection (27) that would render it superfluous, and therefore meaningless, is suspect. See 2A N. Singer, Sutherland Statutory Construction Sec. 46.06 (Sands 4th ed. 1984). The fact that the majority has rejected the construction of "prejudicial to the public interest" that the Meeker affidavit claims was adopted by the executive branch in previous years does not, of course, mean that the majority cannot give any weight at all to the account in the affidavit of prior interpretations of "activities," since it was only the latter issue that the majority felt unable to resolve without resort to prior administrative interpretations. Nevertheless, it does cast some doubt on the validity and usefulness of the Meeker affidavit, and the extent to which it can be said to undermine the government's position sufficiently to make a remand necessary.
 
 
 [3]
 The majority cites Kent v. Dulles, 357 U.S. 116, 128, 78 S.Ct. 1113, 1119, 2 L.Ed.2d 1204 (1958), in characterizing the evidence before us as evidence of "scattered rulings ... not consistently of one pattern." In Kent v. Dulles, however, the Court justified that higher burden of proof placed on the government by reference to the difficult and important constitutional issues implicated by the government's policy. The plaintiffs before us, however, have not presented a single plausible constitutional argument. See supra Part IV
 
 
 [4]
 In cases of this sort, plaintiffs may dispute the United States' view that visa applicants are participants in or affiliated with certain foreign governments. In this case, for example, Finlay and Lezcano, in affidavits filed below, deny that the Federation of Cuban Women is controlled by either the Cuban government or the Cuban Communist Party, J.A. at 216, 245, and the plaintiffs "deny that Mr. Nino Pasti participates in the World Peace Council as an 'instrumentality' of the Soviet government," and state that they "have no information bearing on the accuracy of this characterization for the Council itself." Plaintiffs' Statement of Genuine Issues at 4, J.A. at 175. If the majority means to suggest that these disputes are open to judicial resolution, see maj. op. at 1049 n. 2, then it is making an assumption I find extremely dubious. First, such questions, while containing elements of fact, are largely interpretive. Determining the point at which one institution's influence over another becomes "control" requires a series of policy decisions courts are unequipped, and unauthorized, to make. Second, even if such determinations were within our power and competence, they would require information that might well be too sensitive for the Executive to submit, even in camera. We do not possess, and cannot demand, all of the same detailed and confidential information at the disposal of the Executive. Indeed, even if we had that information, we would not have the surrounding knowledge of such things as the methods of communist operations and linkages to place the information in context. Courts cannot replicate the expertise of the Department of State and proceed to take over the Department's functions. Third, the actual issuance of judicial pronouncements on the question of who is or is not an instrument of a foreign government, and the process of examination that would proceed them, carry the potential of significant disruption of our country's foreign policy
 In order to decide whether the Federation of Cuban Women, for example, is in fact "controlled" by the Cuban government, a court would presumably have to define the degree of influence necessary to constitute "control" and proceed to examine, through witnesses, documentary evidence, and public affidavits, if possible, the conflicting factual assertions and interpretive characterizations made by the private parties and the United States government. The court would wish to examine formal titles and organization charts, but would need in addition to analyze the more informal ways in which the Federation made its decisions and conducted its activities, to see if there existed a veil that needed piercing. Indeed, the foreign governments themselves might wish to participate, and submit their own affidavits disavowing any connection with the visa applicants. Under the Act of State doctrine, we might well be precluded from reaching a decision contrary to the assertions contained in such affidavits, for we would be "inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). A United States court ought not lightly undertake a role in which it must issue a public pronouncement that either the United States or a foreign government is untruthful about an issue of intergovernmental relations. Few exercises could be further outside the bounds of judicial competence, or more intrusive with respect to the conduct of foreign affairs. The United States' characterizations of the relationships between the visa applicants and foreign governments in this case cannot, therefore, be open to legal challenge.
 
 
 [5]
 I do not understand the reliance placed by the majority on the fact that previous visa requests by the same applicants have been granted, maj. op. at 1059, for that in no way calls into question the legitimacy of the government's position. The defendants have not specified before us the reasons for granting the earlier requests because they were not at issue in these cases. In any event, we certainly ought not to require the government to come into court and justify each past visa decision in order to prove a pattern of integrity. That would involve courts in judging the reasonableness of this aspect of United States foreign policy, a task for which they are wholly unsuited. It is for the Executive, and not for courts, to determine when the relevant factors have changed, or when it is appropriate to change tactics even though circumstances remain the same. Additionally, requiring the Executive to justify a pattern of visa grants and denials would force the Department of State either to discuss highly sensitive matters in a public forum or to forego its authority to deny many visas. The denial of a visa is not a declaration of war; it may be a reflection of any of a number of specific and unreported developments affecting relations between nations. Even in relationships long characterized by hostility, there are thaws and chills, conciliatory gestures and confrontational ones. The government is certainly not required to choose between denying all visa requests coming from one country or individual or none at all, and is certainly free to determine that reducing access without eliminating it entirely constitutes an appropriate and measured policy